[No. D039730. Fourth Dist., Div. One. Aug. 1, 2003.]

THE PEOPLE, Plaintiff and Respondent, v.
FRANK WILLIAMS, Defendant and Appellant.

**COUNSEL**

Lewis A. Wenzell, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Gary W. Schons, Assistant Attorney General, Robert M. Foster and Peter Quon, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**NARES, J.**—This is an appeal from a judgment following a jury trial sustaining the People's petition under Penal Code sections 2970 and 2972[1] to extend defendant Frank Williams's commitment as a mentally disordered offender (MDO). The petition alleged that Williams had been convicted of assault with a deadly weapon (§ 245, subd. (a)(1)) in 1991 and assault with intent to commit rape (§ 220) in 1992, and that Williams, originally certified as an MDO in 1996, continued to suffer from a severe mental disorder that made him present a substantial danger of physical harm to other people. In February 2002, the jury found Williams to be an MDO and the court granted the People's petition, extending Williams's MDO commitment an additional year. This timely appeal follows.

Williams asserts that his MDO commitment must be reversed because the court denied his *Faretta*[2] motion to represent himself at the trial on the MDO petition. The People respond by arguing that (1) the right to self-representation does not apply to an MDO commitment proceeding as it is a civil action; and (2) the court did not err in refusing to let Williams represent himself because Williams's request to represent himself was equivocal and limited in scope. In his reply brief Williams recognizes that the *Faretta* federal constitutional right to self-representation does not apply because this is a civil commitment proceeding, not a criminal trial. Nevertheless, Williams asserts that he still had a right of self-representation in this commitment proceeding and that we should apply the standards set forth in *Faretta* in analyzing Williams's request to represent himself.

We conclude first that because this is a civil commitment proceeding that provides for commitment to provide treatment, not punishment, the federal constitutional right to self-representation is not implicated. However, as the MDO commitment statutes provide defendants in such proceedings a right to counsel by statute, Williams could refuse appointed counsel and represent himself. The right to self-representation being statutory only, the trial court's decision on Williams's request to represent himself is governed by due process principles and lies within the sound discretion of the trial court. We conclude that, based upon the record before us, the trial court did not violate Williams's due process rights or abuse its discretion in denying his request to represent himself and, because we are confronted with a civil commitment proceeding, we apply the *Watson*[3] harmless error standard of review. Under that standard, even if the court erred in denying Williams's request for self-representation, we need not reverse the judgment here because it is not

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

[2] *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525].

[3] *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].

more probable than not that Williams would have achieved a better result had he been allowed to represent himself. Finally, we conclude that even if we were to apply the standards applicable to *Faretta* motions in assessing the trial court's denial of Williams's request to represent himself, the court did not err in denying Williams's request, as it was equivocal in nature.

## FACTUAL AND PROCEDURAL BACKGROUND

A. *People's Case*

In 1991 Williams was convicted of assault with a deadly weapon and in 1992 Williams was convicted of assault with intent to commit rape. In 1996, while serving his sentence for those crimes, Williams was admitted to Atascadero State Hospital and certified as an MDO. In 1999 Williams's commitment at Atascadero was extended for one year. At that time he was also transferred to Patton State Hospital (Patton). Williams's commitment was extended for one-year periods each of the next two years, with the last commitment date to expire in January 2002.[4]

In September 2001 the People brought the instant petition to have Williams's commitment extended for another year. In support of the petition, the People submitted the affidavit of Sarla Gnanamuthu, M.D., and a report from the medical staff of Patton that stated that Williams suffered from a severe mental disorder that was not in remission and that he would present a substantial danger of physical harm to others if released from commitment.

In January 2002 a jury trial commenced on the petition to continue Williams's commitment. The People called Mark Kalish, a board-certified psychiatrist, to testify concerning his October 2001 psychiatric examination of Williams. He began his evaluation by reviewing Williams's medical and psychiatric records from Patton. Williams refused to answer Dr. Kalish's questions concerning his underlying crime. Williams did not cooperate with Dr. Kalish's examination and was verbally aggressive with Dr. Kalish. Williams told Dr. Kalish that he believed there was a conspiracy by the White population to keep him imprisoned and that all patients of Patton were being kept there for the sole purpose of allowing the staff to make money. Williams denied having any psychiatric problems, but acknowledged that he had been prescribed and was taking antipsychotic medication. Based upon his review of Williams's medical records and his contact with him, Dr. Kalish opined that Williams suffered from paranoid schizophrenia. Dr. Kalish further opined that Williams posed a significant danger to others if released. Dr. Kalish also

---

[4] Williams appealed from his 2000 commitment, and in November 2001 we issued an unpublished decision affirming that commitment order and judgment. (*People v. Williams* (Nov. 19, 2001, D035886).) The issues raised in that appeal are not relevant to the instant appeal.

stated that because Williams continued to deny having a psychiatric problem and, as a result, would not take his medication even in the controlled environment of Patton, he could not be placed in an outpatient treatment program.

The People also called Clark Clipson, Ph.D, a licensed psychologist, who conducted a psychological evaluation of Williams to determine if his sanity had been restored. Clipson reviewed Williams's medical and psychiatric records from Patton. Unlike with Dr. Kalish, Williams did speak with Clipson about his childhood, adulthood, relationships with people, use of drugs and criminal background. Williams told Clipson that he did not take his medication when he was an outpatient. Williams told Clipson that eating was "traumatic" because "[y]ou don't know if it will kill you or not." When asked if there was anything that he worried about, Williams replied, "The only thing I worry about is I won't have an opportunity to get back at you Caucasians." Clipson opined that Williams suffered from a severe mental disorder and that he posed a high risk of committing a violent or sexual offense if released.

The People also called Williams to testify. Initially, Williams refused to affirm that he would tell the truth in his testimony. He then agreed that he would answer questions as truthfully as he could.

Williams denied that he assaulted a woman in 1980. However, he did admit that he was convicted of assault with intent to commit rape and assault with a deadly weapon in 1991. He admitted telling Clipson that he wanted to be released so that he could socialize and have sexual intercourse with females. Williams stated that there were canned and other foods on the market "that have been poisoned to the public." Williams denied that he was a dangerous person and a threat to other people.

Williams admitted telling a prosecutor in a previous trial that he wanted to hit him. Williams admitted previously testifying that a doctor needed his fingers cut off. He also admitted testifying in a prior proceeding that he struck his former defense counsel in the chest. Williams admitted telling a parole officer that he hoped Allah would destroy the parole officer's wife and children. He also admitted telling Clipson that he was sorry that he "wouldn't be able to get back at the Caucasians."

Williams denied that he suffered from a mental illness. Williams also testified that he did not like taking the medicines the hospital made him ingest because they prevented him from ejaculating.

B. *Defense Case*

Through cross-examination of Clipson, Williams established that he had never attacked any person while he was at the state hospital. Williams also

established through Dr. Kalish that Williams never verbally threatened to harm any person. Williams also was able to get Dr. Kalish to agree that most persons diagnosed with schizophrenia are not confined to hospitals and are permitted to lead normal lives.

On cross-examination by defense counsel, Williams testified concerning the drug and alcohol treatment programs, health centers and job training centers he could utilize if he were released. Williams denied that he needed any treatment. He also testified that he never struck any staff person at the hospital in which he was confined.

## C. Williams's Motion To Represent Himself

In October 2001, Williams brought a Marsden[5] motion to have his then-counsel Joe Cox replaced by new counsel. That motion was granted and Charles Guthrie was appointed as Williams's new counsel.

In January 2002, approximately three weeks before trial, Williams brought a second Marsden motion to have Guthrie relieved as his counsel. Thereafter, counsel clarified that Williams also wished to make a motion to represent himself. The court responded, "So it's not a Marsden motion.—Well, in effect, it is a Marsden motion." The court excused the prosecutor from the courtroom and heard Williams's motion.

Williams explained to the court that he wanted to have Guthrie relieved as his counsel because he had been unable to get in contact with him concerning evidence that he wanted admitted at his trial. Williams told the court that he had only been able to get in contact with Guthrie the night before the hearing and had told Guthrie about the evidence that he wanted introduced, but Guthrie gave him back the material. Williams told the court that because of his inability to have contact with Guthrie he did not want him to continue as his counsel.

Guthrie disputed Williams's claim concerning the amount of contact he had with him, but admitted that he and Williams were in disagreement over what evidence should be introduced at trial. He informed the court that Williams wished to introduce newspaper articles concerning police misconduct and "court misconduct," and that he advised Williams that he did not believe the evidence was admissible. The court informed Williams that it would not allow any such newspaper articles at his trial, as they were irrelevant.

The court and Williams discussed his wish to relitigate the underlying charges that resulted in his incarceration in 1992, and the judge informed

---

[5] *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44].

Williams that the court would not allow him to retry that issue. The court and Williams engaged in a long conversation concerning what evidence was or was not admissible, as well as Williams's problems with the evidence in his previous trials and with the justice system in general. The following colloquy then occurred between the court and Williams:

"THE COURT: I'm not going to sit here and get into a philosophical discussion with you on the judicial system and whether it's corrupt or not corrupt and so forth. I still maintain it's the best system in the whole world. I'm not saying it's perfect, and I'm not going to get into the nitty-gritty of the cases that were tried before me. Particularly, the initial case in 1992, I'm not going to retry that. *What I'm going to do is I'm going to leave Mr. Guthrie on*, and we'll start—

"THE RESPONDENT: And would you sit here and watch me lose, consciously? This is why I say it's corrupt and you won't give me an opportunity.

"THE COURT: You've had many opportunities—

"THE RESPONDENT: *Give me the opportunity to represent myself!* Why would you have a person that him and I don't see eye to eye.

"THE COURT: Because you will not see eye to eye with anyone Mr. Williams.

"THE RESPONDENT: How do you know that, sir?

"THE COURT: Because of the number of attorneys that we've had appointed to you." (Italics added.)

Thereafter, the court denied Williams's motion to represent himself and the following conversation took place:

"THE COURT: I think, *because of the severity of the case, Mr. Guthrie, I'm going to leave you on the case.* [¶] And we should be starting on the 23rd, but I'll give you until the 30th. [¶] Call the attorneys in. [¶] And you'll work with Mr. Williams, Mr. Guthrie,—

"MR. GUTHRIE:—As best I can, your Honor.

"THE COURT: I understand. [¶] And, certainly, I hope, Mr. Williams, that you will work with Mr. Guthrie to the best of your ability.

"THE RESPONDENT: You just want to see it go away, huh?

"THE COURT: No, I don't. I want to do everything I can to have you have a fair trial.

"THE RESPONDENT: Everybody wants me to have a fair trial.

"THE COURT: But in this type of a case, I don't think it would be fair for me to let you try your own case because—

"THE RESPONDENT: *All I ask for is continuances until I can get in contact with the law library to get the information that I necessarily need to represent myself in the relationship to the evidence that you say I can't put in. That's all I ask for.*" (Italics added.)

After the prosecutor returned to the courtroom the court stated: "And I'm denying[] Mr. Williams's motion to have him represent himself because of the severity and complexity of this case."

## DISCUSSION

Williams asserts that his MDO commitment must be reversed because the court denied his *Faretta* motion to represent himself at the trial on the MDO petition. We reject this contention.

A. *Federal Constitutional Right to Self-representation in Criminal Proceedings*

"A defendant in a *criminal* case possesses two constitutional rights with respect to representation that are mutually exclusive. A defendant has the right to be represented by counsel at all critical stages of a criminal prosecution. [Citations.] At the same time, the United States Supreme Court has held that because the Sixth Amendment grants to the accused personally the right to present a defense, a defendant possesses the right to represent himself or herself. ([*Faretta,*] *supra,* 422 U.S. [at p. 819].)" (*People v. Marshall* (1997) 15 Cal.4th 1, 20 [61 Cal.Rptr.2d 84, 931 P.2d 262] (*Marshall*), italics added.)

 Generally, under the *Faretta* test, if a request for self-representation is unequivocally asserted within a reasonable time before the commencement of a trial, and if the assertion is voluntarily made with an appreciation of the risks involved, the trial court has no discretion to deny it. (*Faretta, supra,* 422 U.S. at pp. 835–836; *People v. Windham* (1977) 19 Cal.3d 121, 128 [137 Cal.Rptr. 8, 560 P.2d 1187].)

However, "unlike the right to be represented by counsel, the right of self-representation is not self-executing. In *Faretta*, ... the court held that a knowing, voluntary, and unequivocal assertion of the right of self-representation, made weeks before trial by a competent, literate defendant, should have been recognized [citation]; subsequent decisions of lower courts have required expressly that the defendant make a timely and *unequivocal* assertion of the right of self-representation. [Citations.]" (*Marshall, supra,* 15 Cal.4th at pp. 20–21, italics added.)

"Many courts have explained that a rule requiring the defendant's request for self-representation to be unequivocal is necessary in order to protect the courts against clever defendants who attempt to build reversible error into the record by making an equivocal request for self-representation. Without a requirement that a request for self-representation be unequivocal, such a request could, whether granted or denied, provide a ground for reversal on appeal.... [¶] We share the concern that some assertions of the right of self-representation may be a vehicle for manipulation and abuse .... The high court has instructed that *courts must draw every inference against supposing that the defendant wishes to waive the right to counsel.* [Citation.] It follows, as several courts have concluded, that in order to protect the fundamental constitutional right to counsel, *one of the trial court's tasks when confronted with a motion for self-representation is to determine whether the defendant truly desires to represent himself or herself.* [Citations.] The court faced with a motion for self-representation should evaluate not only whether the defendant has stated the motion clearly, but also the defendant's conduct and other words. *Because the court should draw every reasonable inference against waiver of the right to counsel, the defendant's conduct or words reflecting ambivalence about self-representation may support the court's decision to deny the defendant's motion. A motion for self-representation made in passing anger or frustration, an ambivalent motion, or one made for the purpose of delay or to frustrate the orderly administration of justice may be denied."* (*Marshall, supra,* 15 Cal.4th at pp. 22–23, italics added.)

For example, in *People v. Scott* (2001) 91 Cal.App.4th 1197, 1205 [111 Cal.Rptr.2d 318], the defendant made his *Faretta* motion immediately after the trial court denied his *Marsden* motion to substitute counsel, and his comments indicated that he made the *Faretta* motion only because he wanted to get rid of appointed counsel. In that case the defendant said, "[I]f I can't get a [new] state appointed attorney, then I represent myself," and "For the record, I don't want this attorney representing me. You the court is [*sic*] coercing me." (*Ibid.*) The Court of Appeal held that the trial court properly denied the motion as being equivocal. (*People v. Scott, supra,* at pp. 1205–1206.)

In *People v. Skaggs* (1996) 44 Cal.App.4th 1 [51 Cal.Rptr.2d 376], the defendant asked for a new attorney and, if he did not receive one, he wanted to represent himself. (*Id.* at pp. 5–6.) The *Skaggs* court found the defendant's request was equivocal, explaining, "We disagree with Skaggs that his single statement ... 'I'd like to go pro per if I could' was sufficiently unequivocal to constitute a *Faretta* motion. The statement was made during a hearing on a motion to substitute counsel and was part of Skaggs's explanation of the problems he was having with his appointed counsel. The comment was obviously aimed at impressing upon the court just how dissatisfied Skaggs was with his present counsel." (*Ibid.*)

In *Marshall, supra,* 15 Cal.4th 1, the defendant's request for self-representation came about when the court ordered that he supply blood and tissue samples and his counsel was in agreement with that order. (*Id.* at p. 25.) The California Supreme Court held that the request was equivocal because it was motivated by his desire to avoid the order and because his request was otherwise ambivalent and rambling. (*Id.* at pp. 25–27.)

B. *The Right to Self-representation in Civil Commitment Proceedings*

1. *The MDO commitment statutes*

Section 2970 provides: "Not later than 180 days prior to the termination of parole, or release from prison if the prisoner refused to agree to treatment as a condition of parole as required by Section 2962, unless good cause is shown for the reduction of that 180-day period, if the prisoner's severe mental disorder is not in remission or cannot be kept in remission without treatment, the medical director of the state hospital which is treating the parolee, or the community program director in charge of the parolee's outpatient program, or the Director of Corrections, shall submit to the district attorney of the county in which the parolee is receiving outpatient treatment, or for those in prison or in a state mental hospital, the district attorney of the county of commitment, his or her written evaluation on remission. If requested by the district attorney, the written evaluation shall be accompanied by supporting affidavits. [¶] The district attorney may then file a petition with the superior court for continued involuntary treatment for one year. The petition shall be accompanied by affidavits specifying that treatment, while the prisoner was released from prison on parole, has been continuously provided by the State Department of Mental Health either in a state hospital or in an outpatient program. The petition shall also specify that the prisoner has a severe mental disorder, that the severe mental disorder is not in remission or cannot be kept in

remission if the person's treatment is not continued, and that, by reason of his or her severe mental disorder, the prisoner represents a substantial danger of physical harm to others."

Section 2972 provides in part: "(a) The court shall conduct a hearing on the petition under Section 2970 for continued treatment. *The court shall advise the person of his or her right to be represented by an attorney and of the right to a jury trial.* The attorney for the person shall be given a copy of the petition, and any supporting documents. *The hearing shall be a civil hearing,* however, in order to reduce costs *the rules of criminal discovery, as well as civil discovery, shall be applicable.* [¶] *The standard of proof under this section shall be proof beyond a reasonable doubt, and if the trial is by jury, the jury shall be unanimous in its verdict. The trial shall be by jury unless waived by both the person and the district attorney.* The trial shall commence no later than 30 calendar days prior to the time the person would otherwise have been released, unless the time is waived by the person or unless good cause is shown. [¶] (b) The people shall be represented by the district attorney. *If the person is indigent, the county public defender shall be appointed.* [¶] (c) *If the court or jury finds that the patient has a severe mental disorder, that the patient's severe mental disorder is not in remission or cannot be kept in remission without treatment, and that by reason of his or her severe mental disorder, the patient represents a substantial danger of physical harm to others, the court shall order the patient recommitted to the facility in which the patient was confined at the time the petition was filed."* (Italics added.)

### 2. *Williams's right to self-representation was statutory only*

■ As discussed above, in *criminal* proceedings a defendant has not only the right of representation but also a concurrent constitutional right to represent him- or herself. As we shall discuss, *post,* because MDO proceedings are not punitive in nature they are considered civil proceedings, and therefore there is no *constitutional* right to self-representation. However, as the MDO commitment statutes give defendants the right to appointed counsel, a defendant also could refuse counsel and represent him- or herself. The right only being statutory, any denial of a request to represent oneself is governed by due process principles and the decision is reviewed for an abuse of discretion. As we shall discuss, the court did not violate Williams's due process rights in this case and its decision was not an abuse of discretion.

As quoted above, section 2972, subdivision (a) provides that an MDO commitment proceeding "shall be a civil hearing ...." Further, the Court of Appeal in *People v. Cosgrove* (2002) 100 Cal.App.4th 1266 [123 Cal.Rptr.2d

535] (*Cosgrove*) recently held that MDO proceedings are civil in nature and therefore do not have the same constitutional protections as criminal trials. In that case the court granted the People's directed verdict in an MDO commitment proceeding jury trial. (*Id.* at p. 1269.) The defendant appealed, asserting that his constitutional right to a trial by jury was violated by the court's grant of a directed verdict in the People's favor. (*Ibid.*)

The Court of Appeal held that because MDO proceedings are civil in nature, a defendant's right to a jury trial in such proceedings is of statutory, not constitutional origin. In reaching this conclusion the court first looked to the express direction of the statute, but concluded that the civil label was not dispositive because a proceeding labeled as civil could still be deemed criminal where a defendant proved that it was punitive in purpose or effect. (*Cosgrove, supra,* 100 Cal.App.4th at pp. 1270–1274.) Relying on the case *People v. Superior Court (Myers)* (1996) 50 Cal.App.4th 826 [58 Cal. Rptr. 2d 32], the court in *Cosgrove* noted that " '[t]he purpose of the MDO statutory scheme is to provide *mental health treatment* for those offenders who are suffering from *presently severe mental illness,* not to punish them for their past offenses.' " (*Cosgrove, supra,* at p. 1271, quoting *Myers.*) The court also relied upon the United States Supreme Court's decisions in *Kansas v. Hendricks* (1997) 521 U.S. 346 [138 L.Ed.2d 501, 117 S.Ct. 2072] (*Hendricks*), and *Seling v. Young* (2001) 531 U.S. 250 [148 L.Ed.2d 734, 121 S.Ct. 727], which both held that state sexually violent predator (SVP) acts were civil proceedings. (*Cosgrove, supra,* 100 Cal.App.4th at pp. 1271–1272.) In *Seling,* the Supreme Court "stated that, while states may provide procedural safeguards in these commitment proceedings similar to those afforded to defendants in the criminal context, that does not alter the civil character of such schemes." (*Cosgrove, supra,* 100 Cal.App.4th at p. 1272.) The court in *Cosgrove* also noted that SVP proceedings were substantially similar to MDO commitment trials, the only difference being they only governed the treatment of different types of offenders. (*Id.* at pp. 1271–1272.) The court held, based upon this authority, that the MDO scheme was civil in nature. (*Id.* at p. 1273.)

The court went on to hold that the since MDO statutes did expressly provide for a trial by jury, it was therefore error for the court to grant a directed verdict in the People's favor. (*Cosgrove, supra,* 100 Cal.App.4th at pp. 1273–1275.) However, the court also concluded that since the MDO statute's procedural protections given to a defendant (i.e., right to trial by jury, proof beyond a reasonable doubt and right to counsel) were only of statutory, not constitutional origin (*Cosgrove, supra,* 100 Cal.App.4th at pp. 1273–1274; see also *People v. Montoya* (2001) 86 Cal.App.4th 825, 832 [103 Cal.Rptr.2d 579] [defendant's right to jury trial in MDO proceedings is " 'merely a matter of state procedural law,' and does not implicate the

Fourteenth Amendment"]), any error in denying those protections to a proposed MDO were governed by the *Watson* harmless error standard and were not reversible per se. (*Cosgrove, supra,* 100 Cal.App.4th at pp. 1275–1276.) The Court of Appeal affirmed the trial court's judgment, holding that it was not more probable than not that the defendant would have received a more favorable result if the jury and not the judge had decided the matter. (*Id.* at p. 1276.)

In *People v. Merfeld* (1997) 57 Cal.App.4th 1440 [67 Cal.Rptr.2d 759], the defendant in an MDO proceeding objected that the prosecutor was allowed to call him as a witness in violation of his constitutional right against self-incrimination. (*Id.* at p. 1443.) However, the Court of Appeal held that because MDO proceedings were civil and not punitive in nature, a defendant is "not entitled to a criminal defendant's absolute right to refuse to testify." (*Id.* at p. 1446.) Rather, the defendant in an MDO commitment proceeding would only be entitled to the rights against self-incrimination given to parties in *civil* proceedings: the right not to answer questions that would incriminate him or her in criminal activity. (*Ibid.*) Because the prosecutor's questions concerning the defendant's mental condition did not so implicate the defendant, his required testimony did not violate his Fifth Amendment rights. (*Id.* at pp. 1446–1447; see also *People v. Clark* (2000) 82 Cal.App.4th 1072, 1082 [98 Cal.Rptr.2d 767] [MDO commitment proceedings involve commitment for treatment not punishment and therefore there is no right against self-incrimination applicable to criminal trials].)

In support of his proposition that the constitutional right of self-representation under *Faretta* applies here, Williams cites to two cases wherein Courts of Appeal applied *Faretta* to commitment proceedings similar to the MDO scheme. In *People v. Leonard* (2000) 78 Cal.App.4th 776 [93 Cal.Rptr.2d 180], wherein the defendant alleged error by the court in allowing him to represent himself in an SVP commitment proceeding, the court stated that, "[g]iven the liberty interests involved, *we assume for purposes of argument* that individuals subject to the SVPA deserve the same constitutional protections accorded criminal defendants." (*Id.* at p. 784, italics added.) This, according to the court, included the right to represent oneself. (*Ibid.*)

However, as the court in *Leonard* noted, it assumed without analysis that such constitutional protections applied to SVP commitment proceedings. We find the reasoning in *Cosgrove* and *Merfeld* to be persuasive and decline to follow the assumption stated in *Leonard*. ■ The courts that have analyzed the issue are unanimous in concluding that MDO commitment proceedings are civil in nature and therefore defendants presented with possible commitment do not enjoy the constitutional rights accorded criminal defendants.

Williams also cites *People v. Wolozon* (1982) 138 Cal.App.3d 456 [188 Cal.Rptr. 35], wherein the court also assumed without discussion that there was a constitutional right to self-representation in a proceeding to determine the continued commitment of a defendant found not guilty by reason of insanity. (*Id.* at p. 460.) However, the court in that case also noted that the statute governing such a proceeding (§ 1026.5) specifically provided that a person subject to the proceeding "shall be entitled to the rights guaranteed under the federal and [s]tate Constitutions for criminal proceedings." (§ 1026.5, subd. (b)(7); *Wolozon, supra,* 138 Cal.App.3d at p. 462.) Here, the MDO statutes do not expressly provide for the constitutional protections of criminal trials. We conclude, based upon the foregoing discussion, that the right to counsel (and the right to refuse such counsel) in MDO proceedings is of statutory, not constitutional origin.[6]

Even though Williams recognizes in his opening brief that the right to counsel (and the asserted right not to be compelled to accept such counsel) in MDO proceedings arises from the MDO statute itself, he asserts that the constitutional standards of *Faretta* still apply. Thereafter, in his reply brief Williams states that he is *not* asserting his right arises under *Faretta*, but nevertheless argues that the standards applicable to *Faretta* motions should still apply. The People in contrast argue that because MDO proceedings are civil in nature and the constitutional right to self-representation recognized in *Faretta* therefore does not apply, the court's decision to deny Williams's request to represent himself should be reviewed for an abuse of discretion.

Our holding that the right to counsel in MDO proceedings is a statutory right does not end our inquiry. The statute expressly gives the right to counsel to defendants in MDO proceedings and surely they have by implication the right to refuse appointed counsel and represent themselves. The question then is by what standard are we to judge a defendant's request for self-representation (and a court's denial of such request) in such proceedings?

Even though Williams's right to self-representation was only of statutory origin, once the state has given him such a right, he had an interest in it protected by due process principles. In *Wilson v. Superior Court* (1978) 21 Cal.3d 816 [148 Cal.Rptr. 30, 582 P.2d 117] (*Wilson*), the defendant, representing himself prior to trial, was initially given in-jail propria persona (pro. per.) privileges laid out in a superior court policy memorandum, which were thereafter ordered restricted when he was involved in a "fracas" in the jail. (*Id.* at p. 820.) The defendant sought a petition for writ of mandate,

---

[6] The United States Supreme Court has held that because the right to appeal is of statutory origin, there is no constitutional right to self-representation on appeals from criminal trials. (*Martinez v. Court of Appeal of California* (2000) 528 U.S. 152, 160 [145 L.Ed.2d 597, 120 S.Ct. 684].)

seeking to have his pro. per. privileges reinstated. (*Id.* at p. 821.) He asserted that his constitutional right to self-representation also included a constitutional right to have access to law books, telephones and witnesses. (*Ibid.*)

The California Supreme Court held that, "[e]ven if a defendant has no constitutional right to pro. per. privileges, once they are given he may nevertheless have an interest in them which is protected by the due process clause of the Constitution .... [A] substantial state-created right, even though not constitutionally compelled, may not be arbitrarily withheld." (*Wilson, supra,* 21 Cal.3d at p. 823.) The high court held that due process principles required notice, an opportunity to be heard, and a decision before an impartial hearing body before his pro. per. privileges were taken away. (*Id.* at pp. 825–828.)

We also conclude that although any right to self-representation in this case was only statutory, once given, that right could not be taken away without due process of law. Here, however, Williams was allowed to make a request for self-representation and a hearing was conducted before a judge. The court listened to Williams's arguments, reviewed the record, including his previous requests for new counsel, and denied his request because of the severity and complexity of the case. There was thus no violation of Williams's due process rights here.

Further, we agree with the People that the trial court's decision to grant or deny a request for self-representation, because no constitutional right to self-representation was implicated, was committed to its sound discretion. █ Even where there is no constitutional right to represent oneself, "[c]ourts, of course, may still exercise their discretion to allow a lay person to proceed *pro se.*" (*People v. Martinez, supra,* 528 U.S. at p. 163 [holding there is no constitutional right to self-representation on appeal].) Here, the court properly exercised its discretion to deny Williams's request. As we discuss in more detail, *post,* his request was equivocal and directed only toward certain evidence he wanted to present. Further, although an MDO commitment is not punishment, serious liberty interests were at stake, necessitating competent and experienced counsel. The court was also aware of the defendant's history, his previous commitment proceedings and his prior disagreements with counsel. We cannot say on this record that the court abused its discretion in denying Williams's request to represent himself.

3. *Any error was harmless*

Further, even if the court did err in its handling of Williams's request, the error would not require us to reverse the judgment in this matter. Because the right to counsel in MDO proceedings is a statutory, not constitutional right,

we will reverse only if it is more probable than not that Williams would have received a better result had he been allowed to represent himself. (*Cosgrove, supra,* 100 Cal.App.4th at pp. 1275–1276.) Here, the evidence to support the continued commitment of Williams as an MDO was overwhelming. The People presented the testimony of two experts who opined that Williams was a schizophrenic who posed a substantial danger of physical harm to others. Williams presented no evidence, other than his own self-serving denial that he suffered from a mental illness, to counter these opinions. Further, as discussed, *ante,* the reason for Williams's request to represent himself was to attempt to have articles concerning police and court misconduct admitted into evidence. These articles were irrelevant to the MDO proceeding and, as the court noted, were inadmissible. Any error by the court in handling the request by Williams for self-representation was thus harmless.

### 4. *Even applying Faretta principles, the court did not err*

■ Even if we were to conclude that *Faretta* standards should apply to Williams's motion to represent himself (and we do not), the court did not err in denying William's request to represent himself here because his request was equivocal. The request was made when Williams was upset with counsel for refusing to offer into evidence certain newspaper articles Williams wanted to use. The court then stated that it would not allow Williams to use those newspaper articles. Williams only asserted a request to represent himself related to that evidence and his desire to prove to the court that it was admissible. Nowhere did Williams unequivocally request that he be allowed to represent himself for the entire trial. Rather, his request for substitute counsel, and then to represent himself, came only as a result of Williams's disagreement with defense counsel concerning that evidence, and the court's acknowledgement that it was not admissible. His expressed dissatisfaction with defense counsel and the evidence that would be admitted did not constitute an unequivocal request to represent himself that would necessitate granting a *Faretta* motion. (*Marshall, supra,* 15 Cal.4th at pp. 25–26.) Accordingly, the court did not err in denying Williams's request to represent himself.

### DISPOSITION

The judgment is affirmed.

Huffman, Acting P. J., and Haller, J., concurred.