[No. G043770. Fourth Dist., Div. Three. May 20, 2011.]

THE PEOPLE, Plaintiff and Respondent, v.
JAMES ALAN WRENTMORE, Defendant and Appellant.

COUNSEL ·

Christopher Blake, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Lilia E. Garcia and Quisteen S. Shum, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**IKOLA, J.**—Defendant James Alan Wrentmore challenges the one-year extension of his commitment as a mentally disordered offender. He contends the court erred by allowing him to represent himself at the extension trial. But his rights to counsel and self-representation at that trial are statutory— violations are reviewed for harmless error. No reasonable probability exists that defendant would have obtained a more favorable result if he had been represented by counsel at trial. We affirm.

### FACTS

Defendant was convicted in 2004 of one count each of making a criminal threat (Pen. Code, § 422)[1] and dissuading a witness by force (§ 136.1, subd. (c)(1)) after accosting a bus driver. After a series of parole violations, he was found to be a mentally disordered offender (MDO) in June 2007 and committed to a state hospital until his parole term's expiration in May 2010 (see § 2960 et seq.).

The Orange County District Attorney filed a petition in December 2009 to extend defendant's commitment.[2] The petition attached an affidavit from the state hospital's medical director and a September 2009 psychological evaluation. These documents showed defendant currently suffered from paranoid schizophrenia and had a long history of delusions and hallucinations. His mental illness was not in remission and a substantial danger existed he would physically harm others.

### Defendant Invokes His Right to Self-representation

Shortly before trial, defendant asked to represent himself. The court (Judge Thomas M. Goethals) gave him the questionnaire that criminal defendants use when invoking their *Faretta* right to self-representation. (See *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525] (*Faretta*).) The court continued matters for one day, giving defendant time to fill out the form.

---

[1] All further statutory references are to the Penal Code.

[2] "Not later than 180 days prior to the termination of parole . . . if the prisoner's severe mental disorder is not in remission or cannot be kept in remission without treatment, the medical director of the state hospital which is treating the parolee, . . . shall submit to the district attorney . . . his or her written evaluation on remission. . . . [¶] The district attorney may then file a petition with the superior court for continued involuntary treatment for one year. . . . The petition shall also specify that the prisoner has a severe mental disorder, that the severe mental disorder is not in remission or cannot be kept in remission if the person's treatment is not continued, and that, by reason of his or her severe mental disorder, the prisoner represents a substantial danger of physical harm to others." (§ 2970.)

Defendant returned the completed *Faretta* form when court resumed the next day. He had written "YES" or "NO" to most questions unremarkably. Other answers were puzzling. For the question, "Have you been treated for any emotional/mental illness," defendant wrote, "TRETMENTS SCYPHIATRY MED EDUCATION DIAGNOSIAS SYMTOM DOCTORS PERSCRIBED THIS IT IS HISTREY FOR IF A DANGERS." For the question, "Please explain your views about the form," defendant wrote, "THAT IS MY OWN PERSONAL ACTUALITYS I BE SEE TO JURISDICTIONS OF COURTS. IF IT PREYS FOR MY RIGHTS. I HAVE THOUGHT [ILLEGIBLE]." And for the question, "Please explain briefly why you wish to represent yourself," defendant wrote, "IN THIS CASE MY INOCENTS CAN COME IN ALL ABOVE THAT FORMALY MY OWN LIBILITYS TIME IN INSTITUTIONS IT IS A COMPLAINT TYPE DUE TO I WANTD MAKE OFFICIAL NO DOUBT TO."

The court carefully questioned defendant about his request, especially his curious answers on the questionnaire. Defendant explained: "As far as this goes, I know the seven years on my incident is because of I—was in an absentee. I wasn't absentee, but the parole office—in doing, they false imprisoned me. That's an L.A. sanction. [¶] Also, this 2004 was a mistrial. After the first date there was no arraignment set. The C file does predict what the order is. Each case is switched on different laws coming from—going into the future starting from 2004. This did not have the right competency with police reports and laws and lawyers. [¶] I know the law. I've studied it. And I'm looking to get that dropped, 2004 and all the obvious months." Defendant continued: "I'm explaining. For the accessible rule. I filed a writ in Orange County from San Diego to get a Southern District—to file an order to have my petition to be granted—to have this case dropped. That's what I just explained. [¶] Now I know the evaluation is—I haven't done any danger to anybody for seven years, since 2004 started. I've been all misled by Orange County, by the courts, and by the 422's rules."

The court focused defendant on the pending matter. It stated, "You're not here for an evaluation today. You're here for trial. Did you know that?" Defendant answered, "Yes. Okay, put me on trial. I'll testify." The court continued, "You are here for trial to extend your commitment pursuant to Penal Code section 2970. [¶] Do you know what that means?" Defendant answered, "That means an MDO law. I'm a mentally disordered offender." The court stated, "Right. That's an MDO law. You're exactly right. You're here because you have a right to a trial to extend your commitment, and the People have filed a petition to try to extend your commitment. The case is set for trial, and that trial has to go pretty soon. That's why you're here today."

The court told defendant he currently had appointed counsel, trial might start that day, and defendant would have to be prepared to start representing himself immediately if the court granted his request. Defendant repeatedly confirmed he understood his right to counsel and wanted to represent himself. The court stated the trial judge would treat defendant "just like a lawyer" and warned defendant "[i]t almost always turns out poorly when someone tries to represent themselves when they don't have any formal legal training." The court read aloud from an unpublished appellate court opinion, which reiterated the cautionary statements on the *Faretta* form defendant had completed.[3] The court told defendant, "Those rules will all apply to you, Mr. Wrentmore, if you go out of this courtroom today as your own lawyer. [¶] Do you understand that?" Defendant answered, "Yes."

Finally, the court again warned defendant about representing himself. It stated: "I think this is really a bad idea. I think you're going to hurt yourself and your case if you try to represent yourself when you're not a lawyer. But it's your life and it's your decision. So if you think I'm wrong, and after hearing what I've said you still want to represent yourself, I'm probably going to let you even though I think it's a terrible idea." The court asked defendant, "You still want to represent yourself, is that right?" Defendant answered, "Yes, your Honor."

The court granted defendant's request to represent himself. It noted it had read *People v. Williams* (2003) 110 Cal.App.4th 1577 [2 Cal.Rptr.3d 890] (*Williams*), and understood defendant had the statutory rights to counsel and self-representation. It found defendant knowingly and unequivocally waived his right to counsel. It stated, "It is incumbent upon the court to consider the information I have about Mr. Wrentmore's mental health diagnosis, but I am struck by the fact that it is remarkably similar, I believe, to that which Mr. Williams had [in *Williams*, at page 1581; i.e., paranoid schizophrenia]. [¶] And so while that makes me very cautious about finding that this waiver is free, voluntary, knowing, and intelligent, I have to tell you that in talking to Mr. Wrentmore, I find him responsive. I find him lucid. He seems to know what he is deciding even though, again, I think he understands that I think

---

[3] "Alcala placed his initials in multiple locations, signed, and dated the *Faretta* Waiver acknowledging that (1) it is 'almost always unwise to represent yourself,' (2) he is not entitled to any special privileges or treatment from the judge and he is required to follow all the technical rules of law, (3) he understands the prosecutor will be an experienced, professional attorney and it will not likely be a fair contest because the prosecutors will have an advantage because of their skill and experience, (4) because he is in custody, he will not receive additional library privileges, extra time for preparation, or convenient access to staff or investigators, (5) he forgoes an ineffective assistance of counsel claim that could result in a new trial with competent counsel, (6) if he changes his mind about representing himself during trial, he may not be permitted to continue the trial to obtain an attorney, and (7) his right to represent himself may be terminated and an attorney may be appointed for disruptive behavior." (*Alcala v. Superior Court* (Sept. 14, 2009, G042393) [nonpub. opn.].)

this is a bad idea. [¶] He seemed to comprehend the admonition given in the *Alcala* case. He watched me as I read that very carefully. He seemed to understand the warning I was giving him and the rules that would apply to him. And he seems—even though I think it's a terrible idea, he seems to think it's in his best interest to take on the responsibility of representing himself."

The court paused to confirm Mr. Wrentmore's diagnosis with counsel. It continued, "I have to factor that in. [¶] And that causes me a concern about the defendant's capacity to make an intelligent, free, voluntary, and knowing decision. But talking to Mr. Wrentmore, he seems capable of that. And since that exact situation was an issue in Mr. Williams' case, the Court of Appeal found expressly or impliedly that Mr. Williams had the capacity to make the kind of decision required." The court asked counsel for any comments; defense counsel stated she agreed with the court's "assessment" and "handling" of the situation.

The court accepted defendant's waiver of counsel. It assigned the matter for trial in another department, relieved appointed counsel, but asked counsel "as a friend of the court" to go to the new department "just to make sure everything launches as it should."

*The Extension Trial*

The trial to extend defendant's commitment commenced that afternoon.[4] Defendant told the court he wanted to proceed "right now"—"I will go forward now."

After jury selection, defendant gave an opening statement. He told the jury: "This is in to see for if agreeable. I open with just the point. [¶] On in—in on A there's—one in on A, there's interactions on one or is intellects on B. [¶] Therefore, Judge, it is considered ultimated I did not see to do violated. [¶] Questions I ask to see for the jurors, if it's okay, I'd like to be, to get, to go,

---

[4] At the hearing on a petition to extend an MDO commitment, "[t]he court shall advise the person of his or her right to be represented by an attorney and of the right to a jury trial. . . . The hearing shall be a civil hearing . . . ." (§ 2972, subd. (a).) "The standard of proof under this section shall be proof beyond a reasonable doubt, and if the trial is by jury, the jury shall be unanimous in its verdict. The trial shall be by jury unless waived by both the person and the district attorney. The trial shall commence no later than 30 calendar days prior to the time the person would otherwise have been released, unless the time is waived by the person or unless good cause is shown." (*Ibid.*) "The people shall be represented by the district attorney. If the person is indigent, the county public defender shall be appointed." (*Id.*, subd. (b).)

to be decertified so I can be home again. [¶] Partial, I'd like to ask, please can you be partial? [¶] I am not a violent actor. I don't get dangerous, and I don't attack anybody. [¶] I can be okay in the community. [¶] I can be okay as far as I'd like to do and have process. [¶] I would like to continue to be in one or two with each of my own, that is, I have a support system, and I can get care or I need it or I have to go there to do this. [¶] And on out into where I would be in the community, I would start to adjust. [¶] And, also, I deny about over half or maybe more of all that big percentage of rules that I was told that I was in my team or I did to others. I did not. [¶] I can discuss with my home, family, group, et cetera, if that was or wasn't, if I was right to be at home. [¶] I can start something for health. To this I would like you to consider, too, if it's okay. [¶] I respect it responsibly, and I'd like to go home so I can do so and be on my own care as arranged."

Over the next two days, the People called three mental health professionals as witnesses, including defendant's treating psychiatrist. They opined defendant suffers from "schizophrenia-paranoid type," which was not in remission, and that he poses a substantial danger of physical harm to others. Defendant cross-examined the witnesses. He asked one psychologist whether there were any "write-ups" (disciplinary reports) in his file, and whether if he was "discharged from the hospital, does that mean I would go back to my old ways" when he "carried out crimes" and would "get violent?" Defendant asked his psychiatrist to concede the psychiatrist had taken defendant off of Thorazine, an antipsychotic medication.

Defendant took the stand to testify on his behalf. His testimony, aided by questions from the court, consumes 13 transcript pages. He talked about being sent to the state hospital, having a colonoscopy, getting misdiagnosed as diabetic, attending anger management classes, discussing his medications with his psychiatrist, arguing with hospital staff to use his first name, and having back problems. In response to the court's questions, defendant stated he would not physically harm anyone because he has "no reason to be violent" and had no "history of running anybody down or getting anybody in the street," except when he was homeless and panhandling, which he would not do anymore. He disputed having "schizophrenia paranoid with delusions," but conceded he gets "agitated, but lightly. I'm depressed." Defendant noted he used to work construction, but after getting "on the streets," he started stealing due to "peer pressure." He had been "getting beat up a lot," but never "started much of any of the fights"—a fight was "accidental," an assault was "a mishap," and "the attempted murder was a misdemeanor." He concluded he did not think he was violent—"I think I'm in remission, and I think the diagnosis is the only mistake."

The jury found defendant remained an MDO. The court extended defendant's state hospital commitment until May 2011.

## DISCUSSION

Represented now by appointed appellate counsel, defendant seeks a new trial because the court granted his request to represent himself. He acknowledges the background against which he proceeds is not favorable to his position.

Defendant concedes his continuing MDO status. He admits in his briefing: "present counsel cannot deny that [defendant] has a severe mental problem . . . . It would also be difficult to deny that [defendant] presents a danger to himself and to others as a result of his mental problems and that he is unable to care for himself and that his mental illness is not in remission." Defendant does not dispute the People showed beyond a reasonable doubt his commitment should be extended.

■ Defendant also concedes the little law on point is deferential to the court. He recognizes in his briefing the right to self-representation "is not of constitutional dimension in the civil commitment cases but is merely statutory and it is a matter of discretion for the court to decide." This is so. A commitment-extension trial "shall be a civil hearing" and "[t]he court shall advise the person of his or her right to be represented by an attorney . . . ." (§ 2972, subd. (a).)

■ The leading case on self-representation in MDO hearings, *Williams*, confirmed that right is statutory, not constitutional, and held MDO defendants "surely . . . have by implication the right to refuse appointed counsel and represent themselves." (*Williams, supra*, 110 Cal.App.4th at p. 1591.) The court has discretion "to grant or deny a request for self-representation," as long as it complies with due process by giving the defendant an opportunity to be heard on the request. (*Id.* at p. 1592.) And because a defendant's rights to counsel and self-representation derive from state statutes, any violation is reviewed under the harmless error standard set forth in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243] (*Watson*). (*Williams*, at pp. 1580, 1592–1593; accord, *People v. Cosgrove* (2002) 100 Cal.App.4th 1266, 1275–1276 [123 Cal.Rptr.2d 535] [wrongly denying jury trial to MDO held harmless].) When "the error is purely one of state law, the *Watson* harmless

error test applies." (*People v. Epps* (2001) 25 Cal.4th 19, 29 [104 Cal.Rptr.2d 572, 18 P.3d 2].)

■ Given these facts and this law, defendant would be hard pressed to challenge the judgment on the merits. He does not attempt to do so. He does not contend any reasonable probability exists that he would have obtained a more favorable result had he been represented by trial counsel. (See *Watson, supra*, 46 Cal.2d at p. 836.)

Defendant instead sounds his claim in fairness. He asserts: "Society is not served when individuals are deprived of liberty as a result of proceedings that have all the appearances of a farce even if the ultimate result is 'correct.' We demand a proceeding that not only reaches a fair and just result but one that has all the appearances of fairness and justice." He claims his " 'trial' was patently absurd" in that he "was barely able to express himself at times in a coherent fashion and, for the most part, could engage in 'dialogue' that was little better than 'word salads' composed of disjointed thoughts and random musings that, whether alone or combined, make no sense." He asserts the defendant in an MDO hearing "almost by definition, is utterly incapable of making a truly informed decision regarding self-representation. [¶] [Defendant] submits that it is only in the rarest of cases that a [defendant] in a civil commitment proceeding be allowed to represent himself. The stakes are very high—liberty itself. The [defendant] is often delusional and often has no ability to formulate a coherent thought much less present a coherent case." He concludes, "What is needed from this Court is an opinion that states that, while [a court's] discretion to allow self-representation in civil commitment proceedings exists, it should not be exercised unless the evidence is very strong that the subject truly understands what is at stake and is capable of handling the matter."

These are sober concerns. As the United States Supreme Court has held in the criminal context, "a right of self-representation at trial will not 'affirm the dignity' of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel. [Citation.] To the contrary, given that defendant's uncertain mental state, the spectacle that could well result from his self-representation at trial is at least as likely to prove humiliating as ennobling. Moreover, insofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial." (*Indiana v. Edwards* (2008) 554 U.S. 164, 176–177 [171 L.Ed.2d 345, 128 S.Ct. 2379] (*Edwards*).) "[P]roceedings must not only

be fair, they must 'appear fair to all who observe them.' " (*Id.* at p. 177.) Or as the Supreme Court held earlier when requiring counsel-aided hearings on a criminal defendant's competence to stand trial, "No trial can be fair that leaves the defense to a man who is insane, unaided by counsel, and who by reason of his mental condition stands helpless and alone before the court." (*Massey v. Moore* (1954) 348 U.S. 105, 108 [99 L.Ed. 135, 75 S.Ct. 145].)

A criminal defendant's right to self-representation does provide the closest comparison. The state may not "hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense." (*Faretta, supra,* 422 U.S. at p. 807.) Rather, the defendant may waive the Sixth Amendment right to counsel in favor of self-representation. (*Faretta,* at p. 807.) The waiver must be voluntary, knowing, and intelligent. (*Id.* at p. 835.) And the defendant must be competent to make that choice. (*Godinez v. Moran* (1993) 509 U.S. 389, 396 [125 L.Ed.2d 321, 113 S.Ct. 2680].) The competence standard for waiving counsel is at least as high as the competence standard for standing trial. (*Id.* at p. 398.) So the court does not err by allowing a defendant who is competent to stand trial to waive counsel. (*Ibid.*) But the court also may insist on a higher competence standard for waiving counsel. (*Edwards, supra,* 554 U.S. at p. 174.) "[T]he Constitution permits States to insist upon representation by counsel for those competent enough to stand trial . . . but who still suffer from severe mental illness to the point where they are not competent to conduct trial proceedings by themselves." (*Id.* at p. 178.) If a criminal defendant is incompetent to waive counsel, or the waiver is not knowing and intelligent, allowing the defendant to represent himself or herself violates the right to counsel— according to the weight of authority, the error is reversible per se. (See *People v. Burgener* (2009) 46 Cal.4th 231, 243–245 [92 Cal.Rptr.3d 883, 206 P.3d 420] (*Burgener*) [discussing cases but leaving question open because error was not harmless]; cf. *Faretta, supra,* 422 U.S. at p. 836 [reversing conviction without reviewing for harmless error].)

Should we apply *Faretta* jurisprudence to MDO defendants who seek self-representation? If we did, we would independently review the record to determine whether defendant effectively waived his right to counsel. (*Burgener, supra,* 46 Cal.4th at p. 241.) That would be a close call. At times during the hearing on his request, defendant's words supported the court's conclusions that he was "responsive" and "lucid" and "seem[ed] to know what he is deciding . . . ." At other times, defendant's words were disjointed and fragmented, as they were on the *Faretta* questionnaire. Defendant's trial performance was similarly hit and miss. For every clear remark and pertinent question, there were other displays—like his rambling opening statement and testimony—that may have called into question his competence. If we held defendant was incompetent to waive his right to counsel, or later became incompetent to continue representing himself, could we reverse per se?

That final question draws a clear answer—we cannot reverse without finding prejudice. Despite the close analogy to *Faretta*, this is not a *Faretta* case. This was not a criminal trial. Defendant had no Sixth Amendment right to counsel or self-representation. This was a civil proceeding created by state law, and any right defendant had to counsel or self-representation was created by state law. Violations of these rights must be reviewed for *Watson* error. (*Williams, supra*, 110 Cal.App.4th at p. 1593.) And after careful review, we see no such error. Three mental health professionals examined defendant and found he met the criteria for extended MDO commitment. No mental health professional testified otherwise. We cannot imagine, and appellate counsel does not suggest, anything trial counsel could have done differently that could have avoided an extended commitment—no new evidence, no unexplored theory, no unmade argument.

■ We understand and appreciate defendant's concern that allowing MDO defendants to represent themselves threatens the appearance of fairness. But the Legislature granted MDO defendants the right to counsel, without requiring them to accept counsel. Our courts since *Williams* have consistently held the statutory right to counsel implies a statutory right to reject counsel.[5] Perhaps these decisions by lawmakers and judges were improvident; maybe self-representation threatens an MDO defendant's dignity instead of preserving it. But we may not rewrite statutes. And we are reluctant to inject uncertainty into established case law.

Reluctance aside, we are dutybound to affirm absent a miscarriage of justice. (Cal. Const., art. VI, § 13.) A miscarriage of justice arises from the violation of a state statutory right, like an MDO defendant's right to counsel, only when a reasonable probability exists the defendant would have obtained a more favorable result had the error not occurred. (*Watson, supra*, 46 Cal.2d at p. 836.) And no such reasonable probability exists here. Thus, even if we disagreed that MDO defendants have the right to waive counsel—or even if we held only that defendant's waiver was ineffective—any error here was harmless.

---

[5] (See *People v. Hannibal* (2006) 143 Cal.App.4th 1087, 1092 [49 Cal.Rptr.3d 645] [MDO defendant's "right to represent himself was purely statutory"]; see also 3 Witkin & Epstein, Cal. Criminal Law (2011 supp.) Punishment, § 640, pp. 513–514 ["because the MDO commitment statutes give defendants in these proceedings a right to counsel, a detainee can refuse appointed counsel and by implication represent himself or herself"]; but see *People v. Fraser* (2006) 138 Cal.App.4th 1430, 1445–1446 [42 Cal.Rptr.3d 424] [finding no implied statutory right to waive counsel in Sexually Violent Predator Act proceeding]; *Conservatorship of Joel E.* (2005) 132 Cal.App.4th 429, 440–441 [33 Cal.Rptr.3d 704] [finding no implied statutory right to waive counsel in conservatorship hearing].)

## DISPOSITION

The judgment is affirmed.

Bedsworth, Acting P. J., and Fybel, J., concurred.