[No. H028312. Sixth Dist. Apr. 6, 2006.]

THE PEOPLE, Plaintiff and Respondent, v.
JOHN WILLOUGHBY FRASER, Defendant and Appellant.

**COUNSEL**

Donn Ginoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit and Bridget Billeter, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**BAMATTRE-MANOUKIAN, J.—**

## I. INTRODUCTION

Defendant John Willoughby Fraser appeals from an order of the trial court recommitting him to the Department of Mental Health for a period of two years under the Sexually Violent Predators Act (SVPA). (Welf. & Inst. Code, § 6600 et seq.)[1]

Defendant contends that the trial court erred in (1) denying his motion for self-representation under *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]; and (2) failing to sua sponte instruct the jury that they have a duty to assess the credibility of victim hearsay statements contained in police reports.

For reasons that we will explain, we find no error and therefore we will affirm the recommitment order.

## II. FACTUAL AND PROCEDURAL BACKGROUND

### A. *Defendant's History of Sex Offenses*

Defendant's history of sex offenses includes pleading guilty to five counts of lewd and lascivious conduct (Pen. Code, § 288, subd. (a)) involving three

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

victims under the age of 14: Cherie, Richard, and Mark D. The police reports pertaining to the incidents of molestation also include evidence of sexual conduct involving three other children under the age of 14, Wendy, James, and Mark P., as briefly summarized *post*.

### 1. *The 1979 Convictions: Victim Cherie*

In 1979, the Milpitas Police Department investigated the suspected molestation of 12-year-old Cherie. When she was interviewed, Cherie told the investigating officer that she was molested by defendant several times in January 1979. The first molestation occurred when she visited her friend Wendy, also age 12, at Wendy's house. Defendant was Wendy's stepfather. During Cherie's visit, defendant asked her and Wendy to play strip poker with him. He took off his own clothes and paid the girls $2 for each piece of clothing they removed. After they were all naked, defendant told Cherie and Wendy to touch each other and to rub his penis. Defendant rubbed Cherie's vaginal area with his hand, and he also rubbed his penis up and down to keep it hard.

About one week later, Cherie went to Wendy's house to return a pair of shoes. Wendy was not home, but defendant invited Cherie to come in. While trying to convince Cherie to go into the bedroom with him, defendant put his hand down her underpants and rubbed her vaginal area. Defendant also sat Cherie on his lap and fondled her breasts and vaginal area. On another occasion, Cherie went to Wendy's house so they could walk to school together. Wendy had already left, but defendant answered the door. Defendant told Cherie to wait a minute then returned with his bathrobe open, his legs bare, and his penis exposed. He asked Cherie to come in but she said she had to leave for school.

When Wendy was interviewed, she told the investigating officer that defendant, her stepfather, had been making her undress in front of him and touching her private parts for the past two months. On the most recent occasion, defendant touched her breasts and rubbed her vaginal area while she touched his penis.

On June 25, 1979, defendant pleaded guilty to one count of lewd and lascivious conduct (Pen. Code, § 288, subd. (a)) upon Cherie, a child under the age of 14. Defendant was also charged with committing lewd and lascivious conduct upon Wendy, but that count was dismissed as part of defendant's plea agreement. Defendant was sentenced to 12 months in county jail, suspended, and placed on probation.

## 2. *The 1989 Convictions: Victims Richard and Mark D.*

In September 1988, the Modesto Police Department began investigating the suspected molestation of Richard, age 11. Richard told the investigating officer that he was the son of defendant's employer in San Jose. The first incident occurred in May 1988 after defendant, at the request of Richard's father, picked Richard up at his mother's home in Modesto and took him to San Jose to visit his father for the weekend. During the weekend, Richard and his half-brother, Mark D., then age 13, visited defendant's apartment. Defendant showed them a pornographic movie and began masturbating. He also asked Richard to masturbate him, but Richard refused.

Another incident occurred in July 1988. Richard told the officer that after defendant picked him up in Modesto and they were en route to San Jose in defendant's van, defendant unzipped his pants and started masturbating. Defendant then talked Richard into pulling his own pants down and masturbating. Defendant also asked Richard to masturbate him, which Richard did. When Richard stopped, defendant reached over and rubbed Richard's penis. Later during the same trip, defendant pulled the van to the side of the road and orally copulated Richard. Richard felt afraid because defendant is a big man and because he was away from home and not in a position to get away from defendant.

Richard's stepbrother, Mark D., was also interviewed by a police officer. He recalled three incidents involving defendant in 1987 and 1988, when he was 11 or 12 years old. At that time, defendant was living in a mobilehome in San Jose. The first incident occurred when Mark D.'s parents allowed him to spend the night with defendant. Mark D.'s friend James came along. Defendant showed the boys a pornographic film in his bedroom while he masturbated himself. When they refused his request to take off their pants, defendant pulled both boys onto the bed, took their pants down, and masturbated them. The boys left when the film broke and defendant was occupied in trying to fix it.

On another occasion, Mark D. and his friend Mark P., age 11 or 12, went to the apartment in San Jose where defendant was then living. A pornographic movie was playing in defendant's bedroom. Defendant pulled the boys into the bedroom by the arms and threw them on the bed. He began to masturbate himself while holding Mark P. down with his legs. At the same time, defendant unzipped Mark D.'s pants and began to masturbate him. When defendant let go of Mark P., the boy ran out of the apartment. Mark D. saw defendant ejaculate. Mark P. returned to the apartment to aid Mark D. Defendant told the boys that he would hurt their fathers if they told anyone what had occurred.

A third incident took place in the summer of 1988 when Mark D. and Richard went to defendant's apartment. Defendant locked the door and began chasing the boys around the living room. He cornered them by the refrigerator, grabbed their shirts and pulled them into the bedroom. Defendant then pulled Richard's pants down, started a pornographic movie, and began masturbating himself and Richard. Defendant also grabbed Richard's hand to make Richard masturbate him. Defendant did not do anything to Mark that time.

After defendant was arrested, police officers questioned him about the incidents involving Richard, Mark D., and James. According to the January 1989 police report, defendant waived his *Miranda* rights.[2] Defendant then acknowledged touching Richard's penis during the trips from Modesto to San Jose and admitted that he had been aroused once. Defendant also told the officer that he had masturbated Mark D. on three or four occasions in 1987 and 1988. Although defendant recalled playing pornographic movies for Mark D. and Richard, he denied touching them during those incidents. Defendant also denied holding the boys down on the bed and forcing them to do anything. However, defendant admitted to masturbating James five or six times when defendant lived in the mobilehome in San Jose.

On February 10, 1989, defendant pleaded guilty to four counts of violating Penal Code section 288, subdivision (a), including two counts of lewd and lascivious conduct upon Richard, a child under the age of 14, and two counts of lewd and lascivious upon Mark D., a child under the age of 14. Defendant was sentenced to a total term of 15 years.

### B. *Commitment and Recommitment Proceedings*

In 1997, the Santa Clara County District Attorney filed a petition to commit defendant as a sexually violent predator pursuant to the SVPA. On July 29, 1997, defendant was committed to the Department of Mental Health for a two-year period. In 1999, the district attorney filed a second petition to extend defendant's commitment for a two-year period. The district attorney filed a third petition in 2001 to extend defendant's commitment for another two-year period. Both petitions to extend commitment were granted.[3]

Defendant's commitment on the third petition was due to expire on July 29, 2003. On May 14, 2003, the district attorney filed a fourth petition to extend defendant's commitment as a sexually violent predator for a two-year period. The petition alleged that defendant continued to meet the criteria for

---

[2] *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602].

[3] We affirmed the commitment orders in *People v. Fraser* (July 16, 1999, H017469) (nonpub. opn.), and *People v. Fraser* (Oct. 1, 2003, H025138) (nonpub. opn.).

commitment as a sexually violent predator because he continued to have a currently diagnosed mental disorder and due to that disorder he was likely to engage in sexually violent criminal conduct in the future.

After a hearing, the trial court found that there was probable cause to believe that defendant had been convicted of two qualifying sexually violent offenses against at least two victims, that he had a diagnosable mental disorder that made it likely that he would engage in sexually violent criminal conduct if released, and that the sexually violent criminal conduct would be violent in nature. A jury trial on the fourth recommitment petition was set in November 2004.

### C. *The Jury Trial*

Defendant brought a motion for self-representation pursuant to *Faretta v. California, supra,* 422 U.S. 806 (*Faretta*) that was heard August 20, 2004, over two months before the jury trial commenced on November 3, 2004. At the hearing, defendant explained that he sought to represent himself because he was experienced in sales and he believed that he would be better able to sell himself to the jury.

The trial court denied the motion and explained its reasoning on the record, as follows: "You can be a salesman, but you have the product to sell, and the product is really what is elicited from the witnesses. I'm not convinced that you'll be able to elicit that information. Simply being a nice guy to the jury or looking like a nice guy or not looking like a monster is not enough. There has still got to be evidence that is elicited from [the witnesses]. [¶] I really think that despite all you said . . . looking at the standard that I have to use and exercising my discretion . . . that you are not able to handle the complexity of this case and that justice is only served if you have a lawyer."

The case subsequently proceeded to trial, where the witnesses included psychologists Shoba Sreenivasan, Ph.D., Dale Arnold, Ph.D., and defendant.

### 1. *Dr. Sreenivasan's Testimony*

Dr. Sreenivasan is on the Department of Mental Health's panel of sexually violent predator evaluators. The trial court granted the People's request that she be recognized as an expert in the field of diagnosis of mental disorders and risk assessment. Dr. Sreenivasan evaluated defendant in 2003 by interviewing him and reviewing records, including police reports, court documents, prison records, and records of defendant's commitment at Atascadero State Hospital. In 2004, Dr. Sreenivasan reevaluated defendant by using the same process and reviewing records created after her 2003 evaluation.

Dr. Sreenivasan's evaluations were the same in 2003 and 2004. She testified that defendant has a diagnosable mental disorder, pedophilia involving same- and opposite-sex victims, which is a long-term chronic disorder. The primary basis for her diagnosis was defendant's history of sex offenses involving prepubescent children under the age of 13, as reflected in the police reports and court documents. Dr. Sreenivasan also relied upon defendant's general sexual history and the comments that he had made to other examiners regarding his views on sex with children. In particular, Dr. Sreenivasan noted that defendant appeared to harbor an attitude that sex with children is permissible.

Dr. Sreenivasan also diagnosed defendant as suffering from antisocial personality disorder, which is characterized by an unwillingness to follow rules. She concluded that defendant is likely to commit another sexually violent offense. Her conclusion was based on a number of factors, including her diagnosis of defendant's mental disorder and the results of the Static 99 test. The Static 99 test is an actuarial tool, which showed that defendant's risk of reoffense was high. Dr. Sreenivasan also considered defendant's failure to avail himself of sex offender treatment at Atascadero State Hospital for the past three or four years and his belief that he has zero risk of reoffending.

Dr. Sreenivasan additionally observed that several factors weighed against reoffense, including defendant's age of 66, his completion of psychiatric treatment after his 1979 offense, the onset of offending in defendant's adulthood, and his high level of intelligence. However, these factors did not change Dr. Sreenivasan's opinion regarding defendant's risk of reoffense because defendant's behavior showed that he has no intention of changing or addressing his sexual deviancy.

### 2. *Dr. Arnold's Testimony*

Since 1999, Dr. Arnold has been a member of the Department of Mental Health's panel of sexually violent predator evaluators. Previously, he was a staff psychologist at Atascadero State Hospital and in private practice. The trial court granted the People's request that he be recognized as an expert in the field of diagnosis of mental disorders and risk assessment.

Dr. Arnold evaluated defendant in 2003 and again in 2004. He reviewed police reports, probation officer reports, prior mental health evaluations, hospital records, criminal records and other court documents in the course of preparing his evaluation. In 2004, Dr. Arnold also interviewed defendant. He reached the same opinions about defendant in 2003 and 2004. First, Dr. Arnold determined that defendant suffers from two mental disorders,

pedophilia and a personality disorder with antisocial or narcissistic features. Dr. Arnold's diagnosis was based upon the evidence of defendant's very inappropriate sexual contact with six children, as reflected in the police reports and his interview with defendant, as well as defendant's history of reoffending after he had been convicted and acting upon recurrent fantasies involving prepubescent children.

Dr. Arnold concluded that defendant was likely to commit another sexually violent predatory offense. His opinion was based in part on the Static 99 tool for risk assessment, which indicated that defendant has a high risk of reoffense. Dr. Arnold also considered the nature of pedophilia, which is a chronic and lifelong condition, as well as defendant's consistent refusal of sex offender treatment and his attitude that what he did to the children was not harmful. Defendant's age of 66 was not a mitigating factor in Dr. Arnold's view because defendant intended to engage in an active lifestyle when he was released and he was healthy for his age.

### 3. *Defendant's Testimony*

On direct examination, defendant gave his account of his sexual contact with the child victims. Regarding Wendy, defendant recalled having a parental role during the time he lived with Wendy's mother. He denied having had any sexual feelings for Wendy although he admitted that he had touched her vagina three or four times and become aroused. The strip poker game with Wendy and Cherie occurred after the girls had gotten wet squirting themselves with spray bottles and he put their wet clothing in the dryer. Defendant saw the girls partially clothed and said he would give them a dollar to play strip poker with him. Wendy asked for a dollar for each piece of clothing they removed. Defendant agreed. During the strip poker game, defendant told the girls to touch their breasts and genitals. Defendant pushed the game towards sexual touching because he was sexually aroused. The first time defendant touched Wendy's vagina was during the strip poker game. He fondled her and she touched him twice.

As to Richard, defendant recalled engaging in sexual conduct when he drove Richard from Modesto to San Jose. Defendant touched Richard's genitals through his clothing and rubbed them a little bit. On the occasion when defendant stopped the van at the side of the road in order to secure a tire, he saw that Richard had exposed his erect penis and as a result defendant playfully grabbed him and bit his stomach. Defendant denied that he had ever orally copulated any boy. While defendant admitted that he had shown pornographic films to boys aged 10 to 13 and exposed himself while doing so, he denied that he had masturbated either Richard or Mark D. Defendant also denied that he had chased the boys around the living room, cornered

them by the refrigerator, or held them down and masturbated them. According to defendant, he accidentally touched Mark D.'s penis once. He denied ever touching James's penis.

Additionally, defendant denied ever orally copulating any boy. Defendant explained that he had lied when he testified in 1997 that he had orally copulated Richard and James, but he conceded that any statement he had made to police about masturbating children was "not necessarily" a lie. When he was interviewed by police officers about Mark D., defendant followed their lead and attempted to minimize the incidents. However, defendant admitted that he had touched five children "in a sexual way," including Cherie, Wendy, Mark D., Richard, and James. He found there was something sexually attractive about the children.

When asked about his treatment at Atascadero State Hospital, defendant stated that he had been forced to attend phase one of the treatment and had never gone into phase two. He believes that it is virtually impossible for him to molest a child in the future.

### 4. Documentary Evidence

The documents admitted into evidence included the police reports pertaining to the suspected molestations of Cherie, Wendy, Mark D., and Richard. Defendant objected to the admission of the police reports on the ground that "although the psychologists did testify to a lot of the things in these reports that they base their opinion on, the report still contains other material that they did not testify they relied upon." The district attorney responded that the reports were admissible to show the underlying details of defendant's convictions. The trial court overruled the objection and admitted the police reports into evidence.

### D. Jury Verdict

The jury found the petition alleging that defendant is a sexually violent predator within the meaning of section 6600 to be true. The trial court committed defendant to Atascadero State Hospital for treatment for a two-year period beginning July 29, 2003.

## III. DISCUSSION

### A. Pertinent Provisions of the SVPA

We begin our analysis with an overview of the pertinent provisions of the SVPA. "The SVPA provides for 'the involuntary civil commitment of

certain offenders, following the completion of their prison terms, who are found to be [sexually violent predators] because they have previously been convicted of sexually violent crimes and currently suffer diagnosed mental disorders which make them dangerous in that they are likely to engage in sexually violent criminal behavior.' [Citation]" (*People v. Roberge* (2003) 29 Cal.4th 979, 984 [129 Cal.Rptr.2d 861, 62 P.3d 97]; see § 6600 et seq.) "The civil commitment is for two years, which may be renewed if there is no improvement in the defendant's mental condition." (29 Cal.4th at p. 984.)

■ Under the statutory scheme, proof that a person is a sexually violent predator requires, among other things, a showing that the person "has been convicted of a sexually violent offense against two or more victims." (§ 6600, subd. (a)(1); see *People v. Otto* (2001) 26 Cal.4th 200, 205 [109 Cal.Rptr.2d 327, 26 P.3d 1061] (*Otto*.) Certain enumerated sex crimes constitute a sexually violent offense within the meaning of the SVPA, including a violation of Penal Code section 288, subdivision (a)[4] "when committed by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person . . . ." (§ 6600, subd. (b); see *Otto, supra*, 26 Cal.4th 200, 205.)

■ However, where the victim is a child under age of 14, a showing of force or duress is not required. (*Otto, supra*, 26 Cal.4th at p. 205.) Section 6600.1, subdivision (a), provides, "If the victim of an underlying offense that is specified in subdivision (b) of Section 6600 is a child under the age of 14 and the offending act or acts involved substantial sexual conduct, the offense shall constitute a 'sexually violent offense' for purposes of Section 6600." " 'Substantial sexual conduct' means penetration of the vagina or rectum of either the victim or the offender by the penis of the other or by any foreign object, oral copulation, or masturbation of either the victim or the offender." (§ 6600.1, subd. (b).) "Masturbation" within the meaning of section 6600.1, subdivision (b), includes "any touching or contact of the genitals of either the victim or the offender, whether over or under clothing, with the requisite intent." (*People v. Lopez* (2004) 123 Cal.App.4th 1306, 1312 [20 Cal.Rptr.3d 801], italics omitted; see also *People v. Whitney* (2005) 129 Cal.App.4th 1287, 1294 [29 Cal.Rptr.3d 218]; *People v. Whitlock* (2003) 113 Cal.App.4th 456, 463 [6 Cal.Rptr.3d 389].)

■ The SVPA expressly provides that the details of a sexually violent offense that led to a conviction may be shown by documentary evidence

---

[4] Penal Code section 288, subdivision (a), provides: "Any person who willfully and lewdly commits any lewd or lascivious act, including any of the acts constituting other crimes provided for in Part 1, upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony and shall be punished by imprisonment in the state prison for three, six, or eight years."

including, but not limited to, "preliminary hearing transcripts, trial transcripts, probation and sentencing reports, and evaluations by the State Department of Mental Health." (§ 6600, subd. (a)(3); see *Otto*, *supra*, 26 Cal.4th at p. 206.) Thus, it is implicit in the SVPA that the details of an offense may be proven by the multiple-level victim hearsay statements that are contained in probation reports and derived from police reports. (*Otto*, *supra*, 26 Cal.4th at p. 207.) The California Supreme Court has stated, "The source of the details of the prior offense is not the author of the report, but the victims." (*Ibid.*)

Having reviewed the pertinent provisions of the SVPA, we now consider defendant's challenge to the order committing him as a sexually violent predator for a fourth 2-year period.

### B. *Denial of* Faretta *Motion*

Defendant contends that the trial court committed reversible error when it denied his motion for self-representation under *Faretta*, *supra*, 422 U.S. 806. For several reasons, we are not persuaded that a constitutional right to self-representation exists in a civil commitment proceeding under the SVPA, under either the rationale of *Faretta* or the due process clause. (U.S. Const., 14th Amend.)

#### 1. *The* Faretta *Right to Self-representation*

■ In *Faretta*, the Supreme Court ruled that the defendant in a criminal prosecution " 'has a constitutional right to proceed *without* counsel when he [or she] voluntarily and intelligently elects to do so.' " (*Martinez v. Court of Appeal* (2000) 528 U.S. 152, 154 [145 L.Ed.2d 597, 120 S.Ct. 684], quoting *Faretta*, *supra*, 422 U.S. at p. 807.) The decision in *Faretta* was based on three interrelated arguments: (1) the historical evidence shows the right to self-representation in criminal prosecutions has existed since the beginning of the nation; (2) the right to self-representation is implied by the structure of the Sixth Amendment, which grants a personal right to make one's own defense; and (3) the waiver of the right to counsel must be honored out of respect for the individual. (*Martinez v. Court of Appeal*, *supra*, 528 U.S. at p. 156 (*Martinez*).)

Defendant provides no direct authority for the proposition that the *Faretta* right to self-representation applies in civil commitment proceedings under the SVPA. He acknowledges that in the only California published decision on the issue, *People v. Leonard* (2000) 78 Cal.App.4th 776 [93 Cal.Rptr.2d 180], the appellate court assumed, without deciding, that "individuals subject to the SVPA deserve the same constitutional protections accorded criminal defendants," including a constitutional right to self-representation. (*Id.* at p. 784.)

Defendant bases his claim that the defendant in an SVPA proceeding has a constitutional right to self-representation on the *Faretta* arguments of respect for the individual and the Sixth Amendment right to make one's own defense. According to defendant, "[t]he right to self-representation is ultimately a safeguard of fundamental fairness in the [SVPA] proceedings, necessary to ensure that the defendant is able to present a defense of his own choosing, unconstrained by the 'expertise' of an attorney. If a man should forfeit his liberty, he should be allowed to do so by making the decision how best to pursue his defense while accepting full responsibility for the outcome."

However, the United States Supreme Court has not extended the *Faretta* right to proceedings other than criminal prosecutions. (See *Martinez*, *supra*, 528 U.S. at pp. 159–160.) In *Martinez*, the issue before the Supreme Court was whether the *Faretta* right applied in criminal appeals. In addition to finding no historical basis for a right to appellate counsel, the high court determined that an accused person's rights under the Sixth Amendment are available only "in preparation for trial and at the trial itself" and therefore these rights do not apply in an appellate proceeding. (*Martinez*, *supra*, 528 U.S. at pp. 159–160, 161.)

California appellate courts have also declined to find a Sixth Amendment right to self-representation in proceedings other than criminal prosecutions. (*Baba v. Board of Supervisors* (2004) 124 Cal.App.4th 504, 521–522 [21 Cal.Rptr.3d 428].) In *People v. Williams* (2003) 110 Cal.App.4th 1577 [2 Cal.Rptr.3d 890] (*Williams*), the defendant challenged his commitment as a mentally disordered offender (MDO) under Penal Code sections 2970 and 2972 on the ground that the trial court had committed reversible error by denying his *Faretta* motion to represent himself at the trial on the commitment petition. (*Williams*, at p. 1585.) The appellate court ruled in *Williams* that "because MDO proceedings are not punitive in nature they are considered civil proceedings, and therefore there is no *constitutional* right to self-representation." (*Id.* at p. 1588.) However, the court found a statutory right to self-representation in MDO proceedings. (*Id.* at p. 1591.)

Similarly, it has been determined that the Sixth Amendment does not apply in a juvenile dependency proceeding, and therefore "its structure cannot provide a basis for finding a correlative constitutional right of self-representation" in a proceeding to terminate parental rights. (*In re Angel W.* (2001) 93 Cal.App.4th 1074, 1080 [113 Cal.Rptr.2d 659] (*Angel W.*) The appellate court in *Angel W.* ruled that a parent's right to self-representation in a juvenile dependency proceeding is statutory rather than constitutional, based on language in section 317, subdivision (b), giving the parent the right to waive counsel. (93 Cal.App.4th at pp. 1082–1083.)

In *Conservatorship of Joel E.* (2005) 132 Cal.App.4th 429 [33 Cal.Rptr.3d 704], an objector's request to represent himself in a conservatorship proceeding was similarly found to have no Sixth Amendment basis because the Sixth Amendment right of self-representation applies exclusively to criminal prosecutions. (*Id.* at p. 435.) The appellate court found that a proceeding to commit a proposed conservatee under section 5350, subdivision (d), has a nonpunitive purpose, and therefore the court concluded that conservatorship proceedings are not "sufficiently akin to criminal prosecutions to warrant Sixth Amendment protection." (132 Cal.App.4th at p. 435.)

■ The same reasoning applies to preclude application of the Sixth Amendment in SVPA proceedings. The California Supreme Court has established that SVPA proceedings have a nonpunitive purpose. (*Hubbart v. Superior Court* (1999) 19 Cal.4th 1138, 1144 [81 Cal.Rptr.2d 492, 969 P.2d 584].) "The SVPA . . . is protective rather than punitive in its intent. As we observed in *Hubbart v. Superior Court*, in enacting the SVPA 'the Legislature disavowed any "punitive purpose[]," and declared its intent to establish "civil commitment" proceedings in order to provide "treatment" to mentally disordered individuals who cannot control sexually violent criminal behavior. (See, e.g., Stats. 1995, ch. 763, § 1[, p. 592]; Sen. Com. on Crim. Procedure, Analysis of Assem. Bill No. 888 (1995–1996 Reg. Sess.) July 11, 1995.) The Legislature also made clear that, despite their criminal record, persons eligible for commitment and treatment as SVP's are to be viewed "not as criminals, but as sick persons." ([Welf. & Inst. Code,] § 6250.)' " (*People v. Vasquez* (2001) 25 Cal.4th 1225,1231–1232 [108 Cal.Rptr.2d 610, 25 P.3d 1090].)

■ Consequently, because a civil commitment proceeding under the SVPA has a nonpunitive purpose and is therefore not equivalent to a criminal prosecution, we determine that there is no Sixth Amendment right to self-representation in SVPA proceedings.

### 2. *The Due Process Right to Self-representation*

■ Absent a Sixth Amendment right, the individual right to self-representation "must be grounded in the Due Process Clause." (*Martinez, supra*, 528 U.S. at p. 161; *Angel W., supra*, 93 Cal.App.4th at p. 1082.) A defendant in an SVPA proceeding is entitled to due process protections because civil commitment involves a significant deprivation of liberty. (*Otto, supra*, 26 Cal.4th at p. 209.) However, "due process under the [SVPA] is not measured by the rights accorded a defendant in criminal proceedings, but by the standard applicable to civil proceedings." (*People v. Superior Court (Howard)* (1999) 70 Cal.App.4th 136, 154 [82 Cal.Rptr.2d 481].)

In *Otto*, the issue before the California Supreme Court was whether the details of predicate sex offenses could be proven in an SVPA proceeding by the admission of multiple-level victim hearsay statements contained in pre-sentence reports and derived from police reports.[5] (*Otto*, *supra*, 26 Cal.4th at pp. 203, 208.) The trial court in defendant Otto's SVPA trial denied his motion in limine to exclude police or other hearsay reports regarding his prior sex offenses and to prevent the psychological evaluators from relying on them. (*Id.* at p. 204.) The California Supreme Court affirmed Otto's commitment as a sexually violent predator after concluding that the admission of multiple-level victim hearsay statements in SVPA proceedings does not violate the defendant's due process rights. (*Id.* at p. 203.)

In its analysis, the California Supreme Court in *Otto* applied four factors to determine what process is due in a SVPA proceeding: "(1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail; and (4) the dignitary interest in informing individuals of the nature, grounds, and consequences of the action and in enabling them to present their side of the story before a responsible government official." (*Otto*, *supra*, 26 Cal.4th at p. 210.)

Following our Supreme Court's instruction in *Otto*, we apply the four factors listed *ante* to determine whether due process requires the right to self-representation in proceedings under the SVPA. First, we recognize that the private interests affected by civil commitment under the SVPA include liberty, reputation, and freedom from unwanted treatment. (*Otto*, *supra*, 26 Cal.4th at p. 210.)

Second, we determine the probable value of the right to self-representation as an additional procedural safeguard against the erroneous deprivation of the private interests affected by proceedings under the SVPA. This factor weighs against a constitutional right to self-representation because it is well established that self-representation does not "further the fairness or accuracy of the proceedings." (*Conservatorship of Joel E.*, *supra*, 132 Cal.App.4th at p. 438.) As the Supreme Court in *Faretta* recognized, "[i]t is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. . . ." (*Faretta*, *supra*, 422 U.S. at p. 834.)

---

[5] Section 6600, subdivision (a)(3), "permits the details of predicate offenses to be proven by documentary evidence in [an SVPA] proceeding [and] allows the admission of multiple hearsay that does not fall within any exception to the hearsay rule . . . ." (*Otto*, *supra*, 26 Cal.4th at p. 203.)

The California Supreme Court has also acknowledged that "the rule announced for the first time in *Faretta* is not one which followed from constitutional concepts directed to according to an accused protections designed to aid in the search for truth or to insure the integrity of the fact-finding process." (*People v. McDaniel* (1976) 16 Cal.3d 156, 164 [127 Cal.Rptr. 467, 545 P.2d 843].) "[I]ndeed . . . [it] will most likely have the directly opposite effect." (*Id.* at p. 166.) Therefore, self-representation has no probable value as an additional safeguard against the erroneous deprivation of the private interests affected by SVPA proceedings.

Third, we take into account the government's interest in SVPA proceedings and the fiscal or administrative burden that a right to self-representation would entail. The SVPA "articulates the strong government interest in protecting the public from those who are dangerous and mentally ill." (*People v. Otto, supra,* 26 Cal.4th at p. 214.) This factor does not weigh against finding a constitutional right to self-representation in SVPA proceedings because self-representation is unlikely to place a significant fiscal or administrative burden on the government or potentially impede the government's interest in protecting the public.

■ Finally, we consider whether a right to self-representation is necessary to safeguard a defendant's dignitary interest in an SVPA proceeding. Defendant urges us to find a constitutional basis for the right to self-representation in the respect for the individual that the United States Supreme Court emphasized in *Faretta*. However, the dignitary interest protected in an SVPA proceeding is not equivalent to the *Faretta* concept of respect for the individual in a criminal prosecution. The California Supreme Court has explained that a person subject to the SVPA has a dignitary interest "in being informed of the nature, grounds and consequences of the SVP commitment proceeding" and in "presenting his side of the story before a responsible government official." (*Otto, supra,* 26 Cal.4th at p. 215.)

We determine that self-representation is not necessary to protect the defendant's dignitary interest in an SVPA proceeding. The SVPA contains built-in procedural safeguards to protect the dignitary interest, which include the commencement of the proceedings by a petition supported by the concurring opinions of two psychologists (§ 6604.1, subd. (b)); the right to have access to relevant medical and psychological reports and records (§ 6603, subd. (a)); the right to retain experts to perform an examination (§ 6603, subd. (a)); the right to a probable cause hearing (§ 6602, subd. (a)); the right to a jury trial (§ 6604.1, subd. (b)); and the right to be present at the hearing (§ 6605, subd. (c)).

■ The SVPA also provides for the right to counsel at section 6603, subdivision (a). Accordingly, self-representation is not necessary for a defendant to be informed about the SVPA proceeding or to preserve the ability to tell his or her side of the story, since these rights can be protected by counsel. In light of these statutory protections, we find that a right to self-representation would not further safeguard the dignitary interest.

Having applied the *Otto* factors to determine the extent of due process afforded a defendant in an SVPA proceeding, we conclude that there is no constitutional right to self-representation in SVPA proceedings under the due process clause.

### 3. *The Statutory Right to Self-representation*

Alternatively, defendant suggests that a nonconstitutional right to self-representation in SVPA proceedings exists, arising either from statute or the right to represent oneself in a civil proceeding. We recognize that, as we have discussed, the SVPA provides that a person subject to commitment as a sexually violent predator has a right to counsel, as stated in section 6603, subdivision (a): "A person subject to this article shall be entitled . . . to the assistance of counsel." Language in other statutory schemes providing a right to counsel has been construed to provide a corresponding right to self-representation by implication.

In *Williams*, the appellate court found that the language of the MDO commitment statutes implicitly provides a right to self-representation. Section 2972 states that in a hearing for continued involuntary commitment as an MDO the " 'court shall advise the person of his or her right to be represented by an attorney . . . .' " (*Williams, supra,* 110 Cal.App.4th at p. 1588, italics omitted.) The *Williams* court reasoned that "[section 2972] expressly gives the right to counsel to defendants in MDO proceedings and surely they have by implication the right to refuse appointed counsel and represent themselves." (*Id.* at p. 1591.)

Similarly, the appellate court in *Angel W.* concluded that in the context of juvenile dependency proceedings, the language of section 317, subdivision (b), gives the parent the right to self-representation. (*Angel W., supra,* 93 Cal.App.4th at p. 1083.) Section 317, subdivision (b), provides in pertinent part, "When it appears to the court that a parent . . . is presently financially unable to afford and cannot for that reason employ counsel . . . the court shall appoint counsel, unless the court finds that the parent . . . has made a knowing and intelligent waiver of counsel as provided by this section." The court in *Angel W.* determined that "[t]his limitation on the court's duty to appoint counsel is implicit recognition that the primary right of the parent is self-representation." (*Angel W., supra,* 93 Cal.App.4th at p. 1083.)

Other courts have found a common law right to self-representation in civil cases. This court has previously stated, "Under the law, a party may choose to act as his or her own attorney." (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246–1247 [19 Cal.Rptr.3d 416]; see also *Baba v. Board of Supervisors, supra*, 124 Cal.App.4th 504, 523 [21 Cal.Rptr.3d 428] ["California recognizes a general right to represent oneself in a civil proceeding"]; *Paradise v. Nowlin* (1948) 86 Cal.App.2d 897, 898 [195 P.2d 867] [only a natural person may represent himself or herself].)

In the present case, even assuming arguendo that there is either a common law or a statutory right to self-representation in SVPA proceedings based on the language of section 6603, subdivision (a), and that the trial court erred in denying defendant's motion for self-representation, we believe that reversal is not required under the appropriate standard of review. Defendant asserts that erroneous denial of his motion is reversible error. We disagree. The California Supreme Court has established that erroneous denial of a timely, unequivocal *Faretta* motion is reversible per se. (*People v. Joseph* (1983) 34 Cal.3d 936, 939 [196 Cal.Rptr. 339, 671 P.2d 843].) However, as we have discussed, defendant does not have a constitutional right to self-representation under *Faretta*. Therefore, erroneous denial of his motion does not constitute reversible error under the *Faretta* standard.

We believe that the appropriate standard of review is abuse of discretion. Prior to *Faretta*, the California Supreme Court ruled that a defendant in a criminal case did not have a right to self-representation under the California Constitution, and that denial of a motion for self-representation was reviewable for abuse of discretion. (*People v. Sharp* (1972) 7 Cal.3d 448, 461 [103 Cal.Rptr. 233, 499 P.2d 489] (*Sharp*).) The Supreme Court also applied the harmless error standard under *People v. Watson* (1956) 46 Cal.2d 818, 837 [299 P.2d 243], as follows: "The [trial] court did not abuse its discretion in denying the motion to defend pro se, but even assuming such an abuse we find that such an error clearly could not have resulted in a miscarriage of justice. On review of the entire record, it does not appear reasonably probable that a result more favorable to the defendant would have been reached had he represented himself." (*Sharp, supra*, 7 Cal.3d at pp. 462–463.)

We come to a similar conclusion in the present case. Even assuming that the trial court abused its discretion in denying defendant's motion for self-representation, we find that the error was harmless because the record shows that defendant would not have reached a more favorable result if he had represented himself. Defendant had no complaints about his attorney's performance when he made his motion for self-representation and he has not argued on his appeal that counsel's performance was deficient. Defendant moved for self-representation because he believed that he would be better

able to sell himself to the jury. As defendant stated during the hearing on his motion, "The jury is going to have to be sold because they're going to come in prejudiced against me, and I'm going to have to overcome that prejudice with salesmanship, with the skills that I do have. [¶] . . . [¶] They're going to have to hear it from me, and they're going to have to judge me, not my attorney."

Defendant also acknowledged that he had not done well when he represented himself at the probable cause hearing in a previous SVPA proceeding. When the trial court asked defendant during the hearing on the motion for self-representation, "Have your ever represented yourself in the past on a case?," defendant answered, "I did in Judge Creed's court and I did not do well. . . . There was only going to be the one witness, and when I got into an area where I was unfamiliar, then I had a problem."

On appeal, defendant does not assert that his skills in salesmanship would have allowed him to overcome the evidence before the trial court, which included defendant's admission of substantial sexual conduct involving several children under the age of 14 and the unrebutted opinions of two expert witnesses that defendant has a diagnosed mental disorder that makes him likely to commit another sexually violent predatory offense. The implicit concession that defendant would not have achieved a more favorable result had he represented himself is appropriate given the overwhelming evidence against him, and precludes a finding of prejudice resulting from the denial of his motion for self-representation. Accordingly, we are not persuaded that reversal of the trial court's order granting the People's fourth petition to extend defendant's commitment as a sexually violent predator is required on the ground that the trial court erred in denying defendant's *Faretta* motion for self-representation. As in *Sharp*, the asserted error "clearly could not have resulted in a miscarriage of justice." (*Sharp, supra,* 7 Cal.3d at pp. 462–463.)

### C. *Instructional Error*

Defendant argues that the trial court had a duty to sua sponte modify CALJIC No. 2.20[6] to instruct the jury that it was required to assess the

---

[6] CALJIC No. 2.20 states, "Every person who testifies under oath [or affirmation] is a witness. You are the sole judges of the believability of a witness and the weight to be given the testimony of each witness. [¶] In determining the believability of a witness you may consider anything that has a tendency reasonably to prove or disprove the truthfulness of the testimony of the witness, including but not limited to any of the following: [¶] The extent of the opportunity or ability of the witness to see or hear or otherwise become aware of any matter about which the witness testified; [¶] The ability of the witness to remember or to communicate any matter about which the witness has testified; [¶] The character and quality of that testimony; [¶] The demeanor and manner of the witness while testifying; [¶] The existence or nonexistence of a bias, interest, or other motive; [¶] The existence or nonexistence of any fact

credibility of the victim hearsay statements contained in the police reports. He further contends the trial court's failure to do so compels reversal of the recommitment order because the outcome of the trial depended upon the jurors' assessment of the credibility of the expert witnesses and the reliability of the information on which they relied. However, defendant offers no authority for the proposition that the trial court must specifically instruct the jury in an SVPA trial to assess the credibility of the hearsay victim statements contained in police reports.

The People respond that defendant waived the issue by failing at the time of trial to request either a modification of CALJIC No. 2.20 or a special instruction regarding the credibility of victim hearsay statements. In criminal cases, the general rule is that where a defendant "believed the instructions were incomplete or needed elaboration, it was his [or her] obligation to request additional or clarifying instructions. [Citation.]" (*People v. Dennis* (1998) 17 Cal.4th 468, 514 [71 Cal.Rptr.2d 680, 950 P.2d 1035].) Failure to do so waives the claim of instructional error on appeal. (*Ibid.*)

We need not determine the issue of waiver because we find that defendant's claim of instructional error lacks merit. Our analysis begins with a review of the trial court's obligation to give jury instructions. The California Supreme Court has stated in an SVPA case that "[t]he rules governing a trial court's obligation to give jury instructions without request by either party are well established. 'Even in the absence of a request, a trial court must instruct on general principles of law that are . . . necessary to the jury's understanding of the case.' " (*People v. Roberge, supra,* 29 Cal.4th at p. 988.)

Here, the trial court gave instructions pertaining to witness credibility, including, in addition to CALJIC No. 2.20, CALJIC Nos. 2.13, 2.21.1, 2.21.2, 2.22, 2.23, and 2.27.[7] The trial court also gave CALJIC No. 2.80, which

testified to by the witness; [¶] The attitude of the witness toward this action or toward the giving of testimony [.] [;] [¶] [A statement [previously] made by the witness that is [consistent] [or] [inconsistent] with [his] [her] testimony] [.] [;] [¶] The character of the witness for honesty or truthfulness or their opposites] [;] [¶] [An admission by the witness of untruthfulness] [;] [¶] [The witness' prior conviction of a felony] [;] [¶] [Past criminal conduct of a witness amounting to a misdemeanor] [;] [¶] [Whether the witness is testifying under a grant of immunity]."

[7] As given, the instructions were as follows:

(1) CALJIC No. 2.13: "Evidence that at some other time a witness made a statement that is inconsistent or consistent with his or her testimony in this trial may be considered by you not only for the purpose of testing the credibility of the witness, but also as evidence of the truth of the facts as stated by the witness on that former occasion. [¶] If you disbelieve a witness's testimony that he or she no longer remembers a certain event, that testimony is inconsistent with a prior statement or statements by him or describing that event."

(2) CALJIC No. 2.21.1: "Discrepancies in a witness's testimony or between a witness's testimony and that of other witnesses, if there were any, do not necessarily mean that the

instructed the jury regarding the weight to be given to expert witness testimony.[8] In pertinent part, CALJIC No. 2.80 informs the jury that an expert's "opinion is only as good as the facts and reasons on which it is based." CALJIC No. 2.80 further instructs the jury, "If you find that any fact has not been proved or has been disproved, you must consider that in determining the value of the opinion."

According to defendant, these instructions were insufficient because, with respect to the victim hearsay statements contained in the police reports that were admitted into evidence and relied upon by Dr. Sreenivasan and Dr. Arnold, the jury was prevented from "critically assessing" the victims' versions of events. Defendant insists that the victim hearsay statements "must be evaluated by the jury on an equal footing with the testimony given by the live witnesses at the trial."

---

witness should be discredited. Failure of recollection is common. Innocent misrecollection is not uncommon. Two persons witnessing an incident or a transaction often will see or hear it differently. Whether a discrepancy pertains to an important matter or only to something trivial should be considered by you."

(3) CALJIC No. 2.21.2: "A witness who is willfully false in one material part of his or her testimony is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point unless from all the evidence you believe that the probability of truth favors his or her testimony in other particulars."

(4) CALJIC No. 2.22: "You are bound to decide the issue of fact in accordance with the testimony of a number of witnesses which does not convince you as against the testimony of a lesser number or other evidence which appeals to your mind with more convincing force. You may not disregard the testimony of the greater number of witnesses merely from caprice, whim or prejudice, or from a desire to favor one side against the other. [¶] You must not decide an issue by the simple process of counting the number of witnesses. The final test is not in the number of witnesses but in the convincing force of the evidence."

(5) CALJIC No. 2.23: "The fact that a witness has been convicted of a felony, if this is a fact, may be considered by you for the purpose of determining the [believability] of that witness. The fact of a conviction does not necessarily destroy or impair a witness's believability. It is one of the circumstances that you may take into consideration in weighing the testimony of that witness."

(6) CALJIC No. 2.27: "You should give the testimony of a single witness whatever weight you think it deserves. Testimony by one witness which you believe concerning any fact is sufficient for the proof of that fact. You should carefully review all the evidence upon which the proof of that fact depends."

[8] As given, CALJIC No. 2.80 stated, "Witnesses who have special knowledge, skill, experience, training or education in a particular subject have testified to certain opinions. Any such witness is referred to as an expert witness. In determining what weight to give to any opinion expressed by an expert witness, you should consider the qualifications and believability of the witness, the facts or materials upon which each opinion is based and the reasons for each opinion. An opinion is only as good as the facts and reasons on which it is based. If you find that any fact has not been proved or has been disproved, you must consider that in determining the value of the opinion. Likewise, you must consider the strengths and weaknesses of the reasons upon which it is based. [¶] You are not bound by an opinion. Give each opinion the weight you find it deserves. You may disregard any opinion if you find it to be unreasonable."

For several reasons, we are not persuaded that the trial court had a sua sponte duty to instruct the jury to assess the credibility of the victim hearsay statements contained in the police reports. First, it is well established that while a trial court must give jury instructions upon request that pinpoint the theory of the defense, it must refuse instructions that highlight " ' "specific evidence as such." ' [Citations.]" (*People v. Earp* (1999) 20 Cal.4th 826, 886 [85 Cal.Rptr.2d 857, 978 P.2d 15].) Such instructions " 'invite[s] the jury to draw inferences favorable to one of the parties from specified items of evidence,' [and are] considered 'argumentative,' and therefore should not be given. [Citations.]" (*Ibid.*) Thus, as the People contend, it would be improper for the trial court to give an instruction that invited the jury to view the victim hearsay statements with skepticism. The trial court properly instructed the jury to generally determine whether the facts on which the expert witnesses had relied had been proven or disproven, and to value the experts' opinions accordingly, by giving CALJIC 2.80.

Second, the California Supreme Court ruled in *Otto* that section 6600, subdivision (a)(3), authorizes the use of multiple-level victim hearsay statements, which do not otherwise fall within a hearsay exception, to prove the details of the defendant's sexually violent offenses. (*Otto, supra,* 26 Cal.4th at pp. 207–208.) The court recognized that a victim hearsay statement admitted in an SVPA case "permeates not only the substantial sexual conduct component of the prior crime determination, but also the psychological expert's 'conclusion that [the defendant] was and remained a pedophile . . . likely to reoffend.' [Citation.]" (*Otto, supra,* 26 Cal.4th at p. 210.) "Thus, if these facts are unreliable, a significant portion of the foundation of the resulting SVP finding is suspect." (*Id.* at pp. 210–211.)

However, in *Otto* the California Supreme Court also determined that the admission of victim hearsay statements in SVPA proceedings does not violate due process where the trial court finds that the statements are reliable on the basis of certain factors, including: (1) the context in which the statements appear, such as a presentence report written by a court officer; (2) any indication that the defendant challenged the accuracy of the hearsay statements in the underlying criminal proceedings; (3) the circumstances surrounding the making of the statement, including spontaneity and repetition; (4) the mental state of the declarant; (5) the use of terminology unexpected of a child of similar age; (6) the lack of motivation to fabricate; and (7) whether the hearsay statement was corroborated. (*Otto, supra,* 26 Cal.4th at p. 211.)

In *Otto,* our Supreme Court found that several factors demonstrated the reliability of the victim hearsay statements in that case, including the "most critical factor" of the defendant's conviction of the crimes to which the statements related. The court explained that "[a]s a result of such conviction,

some portion, if not all, of the alleged conduct will have been already either admitted in a plea or found true by the trier of fact after trial." (*Otto, supra,* 26 Cal.4th at p. 211.) The court also found it significant that the defendant had pleaded no contest to the prior sex crimes, because in doing so "he stated the factual basis for his plea was contained in the police reports." (*Ibid.*)

Additionally, the Supreme Court considered that trial courts routinely rely upon hearsay statements contained in probation reports to make factual findings about the details of the defendant's crimes, and that "[d]efendants are required by statute to have an opportunity to review and challenge inaccuracies in the presentence report." (*Otto, supra,* 26 Cal.4th at p. 212.) The court observed that California Rules of Court, rule 4.411.5, which details the contents of presentence reports, contemplates that police reports will be used to prepare crime summaries contained in those reports. (*Otto, supra,* 26 Cal.4th at p. 212.) In the case before it, the court noted that the defendant had never "specifically challenged the accuracy of the victim's statements in the underlying criminal proceeding." (*Otto, supra,* 26 Cal.4th at p. 213.) Instead, the defendant in *Otto* chose to accept a plea bargain rather than confront the victims or other witnesses. (*Id.* at p. 214.)

Further, the California Supreme Court determined that the reliability of victim hearsay statements may be challenged by the defendant in an SVPA proceeding. The defendant has the opportunity to present the opinions of two psychological experts and to cross-examine the People's witnesses. The defendant may also make a motion under Evidence Code section 352 to exclude unreliable hearsay, which acts "as a further safeguard against any due process violation." (*Otto,* 26 Cal.4th at p. 214.) Additionally, we note that the defendant has the opportunity to challenge the credibility of the hearsay victim statements by way of his or her own testimony, as defendant attempted to do in the present case.

Thus, pursuant to the California Supreme Court's ruling in *Otto,* the reliability of victim hearsay statements is tested at the time of trial, where the defendant may move to exclude the statements under Evidence Code section 352 or challenge the accuracy of statements during the presentation of evidence. A specific instruction directing the jurors to assess the credibility of the victim hearsay statements is therefore not necessary to the jury's understanding of the case. For that reason, the trial court had no sua sponte duty to give such a credibility instruction specific to victim hearsay statements. We find the trial court's duty was fulfilled when it gave CALJIC No. 2.80, which, as we have discussed, properly informed the jury to generally determine whether the facts on which the expert witnesses had relied had been proven or disproven, and to value the experts' opinions accordingly.

Even if we assume for purposes of discussion that the trial court did err in failing to give an instruction directing the jurors to assess the credibility of victim hearsay statements, we would find that reversal is not required. Where the trial court fails to give a necessary jury instruction in an SVPA trial, the error is reversible unless it is shown to be harmless beyond a reasonable doubt under the standard established in *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]. (*People v. Hurtado* (2002) 28 Cal.4th 1179, 1194 [124 Cal.Rptr.2d 186, 52 P.3d 116].) In *Hurtado*, the California Supreme Court determined that the trial court's "error in failing to instruct the jury on the need to find a likelihood of future predatory acts was harmless beyond a reasonable doubt." (*People v. Hurtado, supra,* 28 Cal.4th at p. 1194.) The court found that there was "ample evidence to show that defendant was likely to commit future violent sexual acts, and none to indicate that his victims would not include strangers, casual acquaintances, or persons cultivated for victimization." (*Id.* at p. 1194.)

In the present case, the lack of an instruction regarding the credibility of victim hearsay statements was similarly harmless beyond a reasonable doubt in light of the ample evidence demonstrating the reliability of the victim hearsay statements contained in the police reports. Defendant pleaded guilty to and was convicted of six violations of Penal Code section 288, subdivision (a), by sexually molesting Cherie, Richard, and Mark D. Thus, defendant admitted that some portion of the alleged sexual misconduct involving three child victims under the age of 14, including his lewd intent, was true.

Defendant also admitted further details of the crime during his trial testimony in this and previous SVPA proceedings, and these details corroborated the victims' hearsay statements. For example, as indicated in the excerpts of defendant's testimony in SVPA proceedings in 1997 that were admitted into evidence in the present case, defendant testified upon questioning by the district attorney as follows:

"Q. And which of the boys did you orally copulate?

"A. Only two.

"Q. Which two?

"A. James and Richard."

An excerpt from defendant's 2002 testimony, which was also admitted into evidence, includes the following colloquy:

"Q. [W]hat were you rebelling against?

"A. Anything and everything.

"Q. And you chose to act out this rebellion by molesting two 12 year old girls?

"A. At that time, yes."

At the trial in the present case, defendant testified as follows regarding Wendy, his stepdaughter:

"Q. [I]s it true that the first time you touched Wendy's vagina was at that strip poker game?

"A. Yes.

"Q. And then you touched her vagina and had Wendy fondle you, touching her and her touching you about three or four times after that; is that correct?

"A. Whether three or four, I can't say. But I could say two."

Moreover, while defendant during his trial testimony in the present case sought to minimize the sexual nature of his physical contacts with the child victims, including testifying that he had lied when he admitted orally copulating James and Richard, he also expressly admitted to molesting the children who gave victim statements to the police:

"Q. [H]ow many children have you molested in the course of your life?

"A. Molested touching in a sexual way, or it can be construed as sexual, five.

"Q. How many children have you touched in a sexual way?

"A. Five.

"Q. Name them.

"A. Well, it would Cherie and Wendy, and Mark D., Richard S. and James . . . and Richard J."

Based on this record, we find beyond a reasonable doubt that defendant suffered no prejudice from the absence of a jury instruction directing the

jurors to assess the credibility of the victim hearsay statements, because no reasonable juror would have found the statements to lack either credibility or reliability.

## IV. DISPOSITION

The order committing defendant to the Department of Mental Health as a sexually violent predator is affirmed.

Premo, Acting P. J., and Elia, J., concurred.

On April 28, 2006, the opinion was modified to read as printed above. Appellant's petition for review by the Supreme Court was denied August 2, 2006, S143455. George, C. J., did not participate therein. Kennard, J., was of the opinion that the petition should be granted.