Filed 8/21/14  P. v. Maldonado CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　v.<br><br>MANUEL MALDONADO,<br><br>　　　Defendant and Appellant. | B245815<br><br>(Los Angeles County<br>Super. Ct. No. BA399117) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Laura F. Priver and Dennis J. Landin, Judges.  Affirmed.

Alexander Simpson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, State Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Eric E. Reynolds and Peggy Z. Huang, Deputy Attorneys General, for Plaintiff and Respondent.

_____

## *INTRODUCTION*

Manuel Ramirez Maldonado was charged with five counts of possession for sale of five different controlled substances (Pen. Code, §§ 11351, 11375, subd. (b)(1)) , and it was further alleged he had multiple prior drug convictions and had served three prior prison terms.  After representing himself at his preliminary hearing, he told the trial court he wanted an attorney to represent him.  Later, however, he told the trial court he wished to represent himself at trial, and his request was granted.  (*Faretta v. California* (1975) 422 U.S. 806.)  Thereafter, the jury convicted him as charged and found true all special allegations.  In this appeal, Maldonado says the trial court erred as his request for self-representation was equivocal.  He also claims evidentiary error in connection with related forfeiture proceedings.  We affirm.

## *FACTUAL AND PROCEDURAL SUMMARY*[1]

In June 2012, Los Angeles Police Officer Jennifer Cook received a tip from an anonymous caller who told her drug sales were taking place at the McDonald's located near Alvarado and 7th Streets in Los Angeles and a late model white Dodge Dakota with the license plate 8T30343 was involved.  From a search of the Department of Motor Vehicle's database, Cook identified the truck's owner as Manuel Maldonado and also found he had two outstanding arrest warrants.  Officer Cook provided this information along with Maldonado's photograph to her supervisor in the Narcotics Enforcement Detail, Detective Arturo Koenig.

On June 21, at about 5:45 a.m., Detective Koenig went to the specified McDonald's and "set up" on the south side of 7th Street.  Maldonado parked his truck across the street.  As soon as Maldonado started to get out of his truck, a man approached him and the two spoke for a few seconds.  Then Maldonado reached into his truck, pulled

---

[1]     As Maldonado claims error in the trial court's grant of his request for self-representation under *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*) and his other argument on appeal relates to the subsequent forfeiture proceeding, we limit our factual and procedural summary accordingly.

out a black backpack, removed something which he handed to the other man, and the other man gave Maldonado what appeared to be cash.

Following this exchange, Maldonado crossed the street and spoke with several different people in front of the McDonald's for a few minutes and then walked into the McDonald's. Detective Koenig contacted his team who arrived in three additional undercover cars. Later, when Maldonado left the McDonald's and approached his truck, he was still carrying his black backpack. Two detectives stopped Maldonado, and Officer Cook searched his backpack. Inside she found 12 bottles containing a total of 681 pills.[2] The bottles looked like prescription bottles, but seven of them had the labels completely torn off so no identifying information was apparent; the other five bore labels with Maldonado's name. Along with all of these pills, Maldonado's driver's license, a benefit card in his name and $5,323 in cash were inside the black backpack.

Maldonado was charged with three counts of possession for sale of a controlled substance (morphine, Vicodin and codeine, respectively) in violation of section 11351 of the Health and Safety Code and two further counts of possession for sale of a controlled substance (diazepam and clonazepam) in violation of section 11375, subdivision (b)(1) of the Health and Safety Code. In addition, as to all counts, it was further alleged

---

[2]    Four bottles contained codeine. Two were labeled with Maldonado's name, and one of these held 14 pills while the second contained another 64 codeine pills. The other two bottles without Maldonado's name each held 100 pills.

Three bottles contained Vicodin. Two labeled with Maldonado's name held 50 pills in one and 12 in the other; the unlabeled bottle of Vicodin contained 70 pills.

Two bottles without Maldonado's name contained diazepam, with 100 pills in one bottle and 19 pills in the other.

Another unlabeled bottle contained 38 morphine pills. Still another bottle without Maldonado's name contained 43 Carisoprodal pills. Finally, one more bottle with Maldonado's name on the label held 71 clonazepam pills.

3

Maldonado had five prior drug convictions within the meaning of Health and Safety Code section 11370.2, subdivision (a), and, pursuant to Penal Code section 667.5, subdivision (b), it was alleged he had served three prior prison terms.

At trial, the People presented evidence of the facts summarized above. Detective Koenig testified that the area where Maldonado was arrested—near MacArthur Park—was known for the prevalence of drug sales. Based on his training and experience, given the types, quantities and the "street value" of narcotics found in Maldonado's backpack—some labeled in Maldonado's name and others with the labels torn off—as well as more than $5,000 in cash, and his observation of the hand-to-hand transaction he had described, Koenig testified it was his opinion Maldonado possessed morphine, Vicodin, codeine, diazepam, clonazepam for the purpose of sale. Detective Koenig testified a "usable quantity for prescription medication" would typically be one to 12 pills for a "common user." He said it was "very common" for sellers of prescription medication to obtain such medication from doctors for their own use while also selling it on the street; "[i]t's how they support their own habit."

Maldonado testified in his own defense. He admitted his prior drug convictions and prior prison terms. He said he was an "addict" and it was "compulsive" for him to carry a lot of pills as his "comfort." He said he "never wanted any help. I liked my pills."

Regarding his arrest, Maldonado told the jury he believed it had something to do with the fact he had fought a traffic ticket the month before; he said he had been hiding his truck because he thought it was going to be taken. "I'm not going into details, but I made someone very, very powerful mad."

The jury convicted him on all counts and found true all special allegations.

Then in a separate forfeiture proceeding, the same jury determined the $5,323 Maldonado had in his possession at the time of his arrest constituted proceeds of narcotics sales (Health & Saf. Code, § 11351) and therefore subject to forfeiture.

4

The trial court sentenced Maldonado to 10 years in county jail for count 1 (the upper term of four years plus six years for the two prior drug convictions). (Health & Saf. Code, § 11370.2, subd. (a).) The court imposed and stayed a three-year term for one prior drug conviction (Health & Saf. Code, § 11370.2, subd. (a)) and an additional one year for each of the three prior prison terms (Pen. Code, § 667.5 subd. (b)). The court imposed a four-year sentence for counts 2 and 3, and a three-year sentence for counts 4 and 5, to run concurrently with the term imposed for count 1.

Maldonado appeals.

## *DISCUSSION*

**The Trial Court Did Not Err in Granting Maldonado's Request to Represent Himself.**

Maldonado contends the trial court should have denied his request to represent himself as it was equivocal and, according to Maldonado, he was prejudiced as a result of the erroneous grant of self-representation. We disagree.

*Self-Representation and Waiver of the Right to Counsel.*

"'A defendant in a criminal case possesses two constitutional rights with respect to representation that are mutually exclusive.' (*People v. Marshall* (1997) 15 Cal.4th 1, 20 [61 Cal.Rptr.2d 84, 931 P.2d 262].) '[T]he Sixth Amendment guarantees a defendant a right to counsel but also allows him to waive this right and to represent himself without counsel.' (*U.S. v. Erskine* (9th Cir. 2004) 355 F.3d 1161, 1167, italics omitted; see also *People v. Williams* (2003) 110 Cal.App.4th 1577, 1585 [2 Cal.Rptr.3d 890].) 'Criminal defendants have the right both to be represented by counsel at all critical stages of the prosecution and the right, based on the Sixth Amendment as interpreted in *Faretta*[ (1975)] 422 U.S. 806[ (*Faretta*)], to represent themselves.' (*People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1001 [47 Cal.Rptr.3d 467, 140 P.3d 775].) Thus, in any case in which a *Faretta* request for self-representation has been made, the court must evaluate, sometimes under problematic circumstances, two countervailing considerations: on one

5

hand, the defendant's absolute right to counsel, which must be assiduously protected; on the other hand, the defendant's unqualified constitutional right to discharge counsel if he pleases and represent himself." (*People v. Sullivan* (2007) 151 Cal.App.4th 524, 545.)

"'The right to representation by counsel persists until a defendant affirmatively waives it, and courts indulge every reasonable inference against such waiver.' (*People v. Dunkle* (2005) 36 Cal.4th 861, 908 [, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22] [32 Cal.Rptr.3d 23, 116 P.3d 494].) '[T]he waiver of counsel must be knowing and voluntary—that is, the defendant must "actually . . . understand the significance and consequences" of the decision, and the decision must be "uncoerced" [citations].' (*People v. Stewart* (2004) 33 Cal.4th 425, 513 [15 Cal.Rptr.3d 656, 93 P.3d 271].) '"The purpose of the 'knowing and voluntary'"' inquiry '"is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced. . . .'" [Citation.]' (*People v. Welch* (1999) 20 Cal.4th 701, 733–734 [85 Cal.Rptr.2d 203, 976 P.2d 754].)" (*People v. Sullivan, supra,* 151 Cal.App.4th at p. 545.)

"The right to self-representation is waived unless the defendant makes an articulate and unmistakable demand to proceed pro se. (*Faretta, supra,* 422 U.S. at pp. 835-836; *People v. Windham* (1977) 19 Cal.3d 121, 127–128 [137 Cal.Rptr.8, 560 P.2d 1187].) A *Faretta* request must be unequivocal. (*People v. Rogers* (1995) 37 Cal.App.4th 1053, 1057 [44 Cal. Rptr. 2d 107].) 'This rule "is necessary in order to protect the courts against clever defendants who attempt to build reversible error into the record by making an equivocal request for self-representation."' (*People v. Roldan* (2005) 35 Cal.4th 646, 683[, disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22] [27 Cal. Rptr. 3d 360, 110 P.3d 289], quoting *People v. Marshall, supra*, 15 Cal.4th at p. 22.) In determining whether the request is unequivocal, '"the court's duty goes beyond determining that some of [the] defendant's words amount to a motion for self-representation. The court should evaluate all of a defendant's words

6

and conduct to decide whether he or she truly wishes to give up the right to counsel and represent himself or herself and unequivocally has made that clear.'" (*People v. Tena* (2007) 156 Cal.App.4th 598, 607, quoting *People v. Marshall, supra*, 15 Cal.4th at pp. 25–26.)

"'"In determining on appeal whether the defendant invoked the right to self-representation, we examine the entire record de novo. [Citation.]'" (*People v. Stanley* (2006) 39 Cal.4th 913, 932 [47 Cal. Rptr. 3d 420, 140 P.3d 736], quoting *People v. Dent* (2003) 30 Cal.4th 213, 217–218 [132 Cal. Rptr. 2d 527, 65 P.3d 1286].)" (*People v. Weeks* (2008) 165 Cal.App.4th 882, 886-887.)

*The Record Establishes Maldonado's Request to Represent Himself Was Unequivocal.*

According to the record, when the trial court (Hon. Michael Abzug) conducted Maldonado's preliminary hearing on July 6, 2012, he was "present in custody representing himself."[3] Maldonado indicated he was ready to proceed but said he did not waive reading of the complaint or further statement of his constitutional rights so he was advised of all charges and special allegations and received all advisements.

Detective Koenig testified as to the events preceding Maldonado's arrest. Maldonado frequently objected throughout this testimony. The trial court apologized for having to interrupt him—commenting Maldonado was conducting himself as "a gentleman"—but repeatedly advised Maldonado the lawfulness of his arrest and the lawfulness of the impound of his vehicle were not issues before the court in determining "whether the People have established probable cause to believe that a crime has been committed" and urged Maldonado "for [his] own sake" to focus on the issue to be decided at the preliminary hearing.

---

[3] A criminal defendant is entitled to counsel at all "critical stages" of a proceeding when his or her substantial rights may be affected. (*Mempa v. Rhay* (1967) 389 U.S. 128, 134.) The preliminary hearing is such a critical stage. (*Coleman v. Alabama* (1970) 399 U.S. 1, 7.)

At the conclusion of testimony, Maldonado urged the court to dismiss the charges against him, arguing Detective Koenig had committed perjury, "this is personal" and "has nothing to do with narcotics investigation." He repeatedly stated he had a valid prescription "which puts him in legal position [sic, possession]."

At that time, the trial court explained: "The arguable fact that you might have been lawfully in possession of Vicodin and the other controlled substances at the time of your arrest is not a complete defense because . . . as you point out, you are not charged with possession, you are charged with unlawfully possessing for the purpose of sales these items. [¶] And the fact that you may have lawfully possessed them does not give you the right to sell them on the street, which is what you are charged with." The trial court then denied Maldonado's motion to dismiss and ordered that he be held to answer as to all counts and special allegations.

At the conclusion of his preliminary hearing, Maldonado stated, "I wish to give up my right [to] pro per status." The trial court told Maldonado his request had been noted in the court file and would be addressed on July 20.

According to the minute order of that date (July 20, 2012), the trial court (Hon. Laura F. Priver) noted Maldonado had "relinquishe[d] his pro per status" and Maldonado was referred to the public defender's office. Deputy Public Defender Juan Perez then appeared on Maldonado's behalf for his arraignment. After Maldonado pled not guilty to all five counts, defense counsel requested a bail review hearing for the next court date, and Maldonado was served in open court with a notice of forfeiture.

On August 7, Maldonado's motion for release on his own recognizance or for a reduction of bail (set at $210,000) was denied, and a pre-trial hearing was set for August 30.

On August 30, defense counsel (Perez) informed the trial court Maldonado "is going to request to go pro per and to relieve me as the attorney." The trial court (Hon. Laura F. Priver) told Maldonado representing himself was a bad idea in the court's view,

8

and he said he understood.  The trial court directed Maldonado to review and complete the *Faretta* form he was then provided, indicating the court and Maldonado would have a further discussion once he had had the opportunity to do so.

Maldonado completed the four-page form entitled "ADVISEMENT AND WAIVER OF RIGHT TO COUNSEL (*Faretta* Waiver)," indicating he was 46 years of age, could read and write and had completed 12 years of education.  He initialed all 28 boxes provided beside numerous advisements regarding his constitutional rights as well as the multiple enumerated "**DANGERS AND DISADVANTAGES OF SELF-REPRESENTATION**[,]" "**CHARGES AND CONSEQUENCES**" and "**COURT'S ADVICE AND RECOMMENDATION**" he acknowledged he understood.  He signed and dated the form beneath the final advisement reading as follows:  "**I hereby certify that I have read, understood and considered all of the above warnings included in this petition, and I still want to act as my own attorney.  I freely and voluntarily give up my right to have a professional attorney represent me.**"

Then, Maldonado confirmed his request on the record with the trial court, acknowledging he had initialed each of the boxes on the waiver form, and after being advised of the many disadvantages and consequences of self-representation, reiterated it was his intention to represent himself:

"The Court:  All right.  And I notice initials in the boxes at the end of each of the statements on the form.

"Are those your initials?

"[Maldonado]:  Yes, they are.

"The Court:  And you understand that the court recommends that you have counsel who is trained in the law to represent you?

"[Maldonado]:  Yes, I do.

"The Court:  Okay.  The court's experience, that representing yourself pro per doesn't usually work out for the individual doing that.

9

"Do you know what I mean by that?

"[Maldonado]: Yes, I do.

"The Court: All right. I am not saying it is not your right[;] it is, but I just want you to be sort of forewarned.

"[Maldonado]: I understand.

"The Court: You will be treated as if you had a legal education. You may or may not get access to the law library, given the fact you are in custody, and it will be difficult to, you know, make phone calls, get supplies, all that. That is one of the risks that you are taking.

"Do you understand that?

"[Maldonado]: Yes, I do.

"The Court: Is it still your desire to represent yourself?

"[Maldonado]: Yes, it is.

"The Court: Is there something that you are trying to accomplish by doing this?

"[Maldonado]: Well, let me just—

"The Court: Don't say anything about the facts.

"[Maldonado]: I am not going to say anything about the facts.

"But as far as representing myself, any time we have an attorney who stands right next to you and asks to be heard and—

"Any time you have an attorney who stands next to you and asks to be heard and doesn't say a word on your behalf, then there is something wrong.

"The Court: Okay.

"[Maldonado]: And then he stands and lies to you in your face? Yes.

"The Court: All right. I mean, I think that is kind of not an uncommon situation that because for some reason counsel and the client don't get along, the client feels it's appropriate to go pro per. However, I think that what—the only caution the court would

10

say is that you know you don't have to personally like each other. All he has to do is represent you. And as long as he is doing that, that's what is required by law.

"You know, it is always better if you get along, and that your are confident, but oftentimes going pro per for that reason doesn't necessarily benefit you. But it's your decision. I am not trying to talk you out of it. I am just saying—

"[Maldonado]: I understand.

"The Court: What is the saying: cutting your nose off despite [sic, to spite] your face?

"[Maldonado]: Yes.

"The Court: Okay. Is it still your desire to go pro per?

"[Maldonado]: Yes, it is.

"The Court: And you can read and write; is that correct?

"[Maldonado]: Yes.

"The Court: And you completed 12th grade?

"[Maldonado]: Excuse me?

"The Court: You completed 12th grade[?]

"[Maldonado]: Yes.

"The Court: And you graduated from high school?

"[Maldonado]: Yes.

"The Court: All right. And you understand everything on the form, and you understand that the People, the district attorney, is going to be represented by someone with quite a bit of experience, as well as a law school education.

"Do you understand that?

"[Maldonado]: Yes, I do.

"The Court: And we are not going to cut you any breaks.

"[Maldonado]: I understand.

"The Court: Okay. I will grant you your pro per status."

11

The court confirmed: "So you were pro per before, Mr. Maldonado?" "Yes[,]" Maldonado acknowledged.

Having reviewed this record in its entirety—not only the hearing date on which he made this request but also his conduct before and after that hearing (*People v. Sullivan, supra,* 151 Cal.App.4th at pp. 550-553), we reject Maldonado's characterization of his own conduct as "repeatedly vascillat[ing] between requesting representation and self-representation" in support of his contention on appeal that his request to represent himself at trial was "equivocal."

We note that Maldonado initially represented himself at his preliminary hearing— which demonstrated to him the drawbacks of self-representation as he recognized—and he requested an attorney. Then, dissatisfied with representation by his attorney, Maldonado informed his counsel who then informed the trial court Maldonado wished to represent himself (again). "[An] unequivocal request only triggers the inquiry into whether the defendant is competent to make the request and whether he understands the risks and disadvantages attendant to self-representation." (*People v. Phillips* (2006) 135 Cal.App.4th 422, 429.)

After the trial court provided Maldonado with the time and opportunity to review and complete a "*Faretta* Waiver" form (see *People v. Silfa* (2001) 88 Cal.App.4th 1311, 1322 [the form is "a means by which the judge and the defendant seeking self-representation may have a meaningful dialogue concerning the dangers and responsibilities of self-representation"]), Maldonado and the trial court engaged in a further discussion on the record to assess whether Maldonado's invocation of his right to represent himself was both knowing and voluntary. The record establishes that it was. (*People v. Marshall, supra,* 15 Cal.4th at p. 24.) Maldonado said he was ready to proceed to trial 10 days after his request was granted, he did not request a different attorney, substitute counsel or otherwise give any indication he had acted "under a cloud of emotion" (*People v. Tena, supra,* 156 Cal.App.4th at p. 607) or "in passing anger or

12

frustration [or] ambivalen[ce]" (*People v. Marshall, supra,* 15 Cal.4th at p. 23); to the contrary, the record demonstrates Maldonado "truly desire[d]" to represent himself. (*People v. Tena, supra,* 156 Cal.App.4th at p. 607.)

Indeed, after his request was granted, when Maldonado testified on his own behalf, he told the jury about how he got "hooked" on pills and how he only kept such a large quantity because it was a "compulsive thing" and they were his comfort.  He repeatedly told the jury that he had the pills because he had prescriptions and they were his.  He said some people may not feel he was right but it was how he felt.  He said he had gone to law school for about a year to educate himself and that his lawyer in an early case had told him to accept a plea so now it was always assumed he had the pills for sales but he said he had prescriptions and they were his.  According to the record, Maldonado was dissatisfied with having *any* attorney stand in the way of his desire to tell the jury what he wanted to say; he acknowledged that he had made mistakes but specifically stated he was glad he had the opportunity to tell his own story.  We find "no confusion on [Maldonado's] part regarding the risks of self-representation, or the complexities of his case, much less than his election to represent himself was anything other than voluntary." (*People v. Weber* (2013) 217 Cal.App.4th 1041, 1060 [disruptive behavior after trial court grant of *Faretta* motion does not compel revocation of pro per status].  We find no error.  (*People v. Sullivan, supra,* 151 Cal.App.4th 524, 526 ["If the trial court's warnings communicate powerfully to the defendant the 'disadvantages of proceeding pro se,' that is all '*Faretta* requires'"].)

**The Trial Court's Exclusion of Maldonado's Testimony Regarding Whether He Had Filed a Tax Return Did Not Constitute Prejudicial Error.**

At the civil forfeiture proceeding after trial, the prosecution again presented evidence regarding the various pills and $5,323 in cash found in Maldonado's backpack. Detective Koenig testified to the street value of the different types of pills ($10 to $20 per pill for morphine and $2 to $5 per pill for the other four controlled substances in

13

Maldonado's possession), amounting to a total street value of $2,000 to $3,000. Based on the facts presented, Detective Rosalinda Gutierrez, assigned to the asset forfeiture division, opined the cash seized was narcotics transaction proceeds or traceable as such.

Maldonado testified the money was actually in a diabetic kit holder in his pants and said he had been saving $500 a month for a year. He said the money came from winning the lottery a couple of times, performing odd jobs and buying storage units.

Maldonado asked himself if he had "filed any taxes," but the trial court sustained the prosecutor's relevance objection.

Maldonado argues this evidence was improperly excluded because the trial court deprived him of the opportunity to present plausible evidence supporting his defense. According to the Attorney General, the evidence was irrelevant, and even assuming error, any alleged error was harmless under *People v. Watson* (1956) 46 Cal.2d 818, 836.

Although we reject the Attorney General's assertion the evidence was not *relevant* (Evid. Code, § 210, italics added ["'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having *any tendency* in reason to prove or disprove any disputed fact that is of consequence to the determination of the action"]), we agree that Maldonado has failed to demonstrate prejudice resulting from the exclusion of this testimony.

The jury did hear Maldonado's testimony that the cash in his possession was attributable to sources other than drug sales. Even assuming Maldonado's own testimony he had filed a tax return would bolster (indirectly) his claim he had other sources of cash, evidence Maldonado had filed a tax return would not conclusively establish the cash found at the time of his arrest was derived from these alternate sources. Given the evidence of the quantity and street value of the drugs found along with the cash in Maldonado's backpack as well as the testimony regarding Maldonado's conduct at the time, it is not reasonably probable on this record the jury would have come to a different

14

conclusion if the trial court had allowed Maldonado to present this further testimony. (*People v. Marks* (2003) 31 Cal.4th 197, 226-227.)

## *DISPOSITION*

The judgment is affirmed.

**WOODS, J.**

**We concur:**

**PERLUSS, P. J.**

**SEGAL, J.** [*]

---

[*]Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.